*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0439P (6th Cir.)
File Name: 03a0439p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

VENCARE ANCILLARY
SERVICES, INC.,
  *Petitioner/Cross-Respondent,*

  *v.*

NATIONAL LABOR RELATIONS
BOARD,
  *Respondent/Cross-Petitioner.*

Nos. 01-2165/2300

On Petition for Review and Cross-Application
for Enforcement of an Order of the National
Labor Relations Board.
Nos. 25-CA-26096; 25-CA-26096-2

Argued: October 23, 2003

Decided and Filed: December 11, 2003

Before: KENNEDY and GIBBONS, Circuit Judges;
ALDRICH, District Judge.*

---

*   The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

## COUNSEL

**ARGUED:** John V. Nordlund, Fairfax, California, for Petitioner. Meredith L. Jason, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent. **ON BRIEF:** John V. Nordlund, Fairfax, California, for Petitioner. Meredith L. Jason, Aileen A. Armstrong, Kira Vol, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent.

## OPINION

KENNEDY, Circuit Judge. This case presents an appeal from the Board's order finding that Petitioner--Cross-Respondent Vencare unlawfully discharged five employees for engaging in a protected activity under the National Labor Relations Act ("Act"). Petitioner argues that the Board erred in several respects, including its holding that the employees' conduct did not constitute an unprotected partial strike. We deny the enforcement of the Board's order.

### BACKGROUND

Petitioner was a subsidiary of Vencor, Inc., a national health care provider based in Louisville, Kentucky that operated hospitals, skilled nursing facilities and nursing homes, including Hermitage Nursing and Rehabilitation Center ("Hermitage").[1] Petitioner contracted rehabilitation services to Vencor. At all relevant times, Bryan Stuart was

---

[1] After the trial in this case, Vencor, Inc. filed for Chapter 11 bankruptcy. It has since emerged with a new name, Kindred Healthcare, Inc.

the on-site supervisor of Petitioner's employees at Hermitage, including physical therapists, physical therapy aides, speech and language therapists, and rehabilitation technicians. The Hermitage therapists were paid hourly wages rather than a salary, but did not punch a  time clock.  Instead, they each filled out a daily activity report ("DAR") each evening, describing that day's work.  Petitioner calculated the therapists' pay according to the number of hours they claimed on their DARs.

On May 29, 1998, Petitioner announced wage reductions for its rehabilitation employees, effective July 1. On the same day, Stuart met with his employees to explain the wage changes.  The employees, upset by the news, began discussing among themselves in early June what actions to take to reverse the decision. On Friday, June 19, a group of the rehabilitation employees met after work at Moreland Park, near Hermitage.  This group included Norman deCaussin,[2] Evonne Higdon, Barbara Thomas, Lisa Winkler, Nil Kanth-Bohre, and Martha Severs ("Vencare Five.")[3]  At the meeting, the group drafted a letter containing their demands related to the wage reductions and raising other issues, including work load and scheduling.[4]  The group selected deCaussin to represent them at the meeting with Stuart on June 23.

---

[2]Norman deCaussin was the only employee not affected by the wage cut.

[3]They elected the name "Vencare Five" since Kanth-Bohre dropped out because of concerns over his immigration status.  Traci O'Rourke signed the letter unaware that it contained the threat to stop seeing patients.  Upon learning of that "detail" at the June 23 meeting with Stuart, she went back to seeing the patients.

[4]The employees testified at the hearing before the administrative law judge that the group only wanted to reverse the wage adjustment; it merely raised the issues such as work load and scheduling, to support their claim that the wage adjustment was unwarranted.

---

DeCaussin told Stuart that the employees were going to refuse to see patients that day until someone from upper management met with them to discuss their issues. DeCaussin also said that the group would remain on the premises. Severs testified that the group informed Stuart that they "were going to . . . do other work such as paper work until corporate agreed to talk to [them]."[5]  No one said they were on strike, nor were the terms "strike" and "work stoppage" ever used.  Stuart told them he would fax the letter to Kevin Mack, his superior. He also asked the Vencare Five to continue seeing patients until he received a response from the upper management. The group refused and returned to the therapy office to do paperwork and other projects.[6]  At some point that morning, Thomas told Stuart that if the issue was not addressed, she would quit.[7]

Over the course of the morning of June 23, Stuart met individually with each employee who was refusing to see patients. He explained that their refusal to see patients was an entirely different matter from their grievance letter, and that refusing to see patients could have serious consequences for their jobs.  Around noon, deCaussin told Stuart that he was not feeling well and was going to go home. He also said that if Stuart needed anything, he should call deCaussin at home. The other four employees told Stuart about the same time that

---

[5]DeCaussin, Higdon and Thomas acknowledged that the group informed Stuart that they were going to stop seeing patients but did not testify that the group would continue to do other work.

[6]The employees told Stuart that the therapists who were refusing to see patients did not expect to be paid that day, and none of the five filled out a DAR for that Tuesday.

[7]Only Thomas actually told Stuart that she would quit.  Thomas and Higdon testified, however, that they not only intended to resign, but considered themselves as having already resigned before being informed of their termination.

they were taking "their designated lunch," but that they would return. When they returned from their lunch break, Stuart told them that he heard from management, and had been instructed to tell them to go home until further notice. The group met at 2:30 p.m. in the park to discuss whether to picket the Hermitage facility. They decided not to do so.

On June 24, they met again and drafted letters which were faxed to corporate management, in which they requested a meeting to address their grievances. On June 24, Petitioner decided to terminate the employees who refused to see patients for insubordination. Stuart called all five employees on June 24 to schedule individual meetings with them the following morning. The employees telephoned each other and agreed to meet with the management only as a group. When they arrived at Hermitage the next morning, they informed Stuart they would only meet as a group. Stuart then told all of them at once that they were being terminated for insubordination due to their refusal to see patients on June 23. Nearly eight months later, on February 12, 1999, Petitioner sent each of the five discharged therapists a paycheck for Tuesday, June 23.

This case originated with an unfair labor practice charge, filed against Petitioner by Severs on September 24, 1998. The General Counsel issued a complaint on October 30, 1998. Following a hearing, an administrative law judge dismissed the complaint on May 28, 1999.[8] Petitioner and the General Counsel both excepted to the judge's decision before the

---

[8] The ALJ found that Petitioner did not violate the Act because the employees' work stoppage was unprotected. The ALJ found that the employee group was a "labor organization" within the meaning of Section 2(5) of the Act, and had failed to comply with Section 8(g), which requires that a labor organization give 10 days notice before engaging in a work stoppage at a healthcare institution. However, the ALJ rejected Petitioner's alternative argument that the employees had engaged in an unprotected partial strike.

Board. On August 6, 2001, the Board issued a Decision and Order reinstating the complaint, finding that Petitioner had violated Section 8(a)(1) of the Act (29 U.S.C. § 158(a)(1)).

## STANDARD OF REVIEW

Under the Act, the scope of this Court's review of the Board's findings is limited. *First Healthcare Corp. v. NLRB*, 344 F.3d 523, 528 (6th Cir. 2003). More specifically, "the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e). "Evidence is considered substantial if it is adequate, in a reasonable mind, to uphold the decision." *Turnbull Cone Baking Co. of Tennessee v. NLRB*, 778 F.2d 292, 295 (6th Cir. 1985) (per curiam)(citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)). Although this Court "should consider the evidence contrary to the Board's conclusions," it "may not conduct a *de novo* review of the record." *Id.* (citing *Union Carbide Corp. v. NLRB*, 714 F.2d 657, 600 (6th Cir. 1983)). "When there is a conflict in the testimony, 'it is the Board's function to resolve questions of fact and credibility,' and thus this court ordinarily will not disturb credibility evaluations by an ALJ who observed the witnesses' demeanor." *Id.* (quoting *NLRB v. Baja's Place*, 733 F.2d 416, 421 (6th Cir. 1984)). "The Board's application of the law to particular facts is also reviewed under the substantial evidence standard. . ." *Id.* (citations omitted). However, "[i]f the Board errs in determining the proper legal standard, the appellate court may refuse enforcement on the grounds that the order has 'no reasonable basis in law.'" *Id.* (quoting *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497 (1979)).

## ANALYSIS

On appeal, Petitioner argues that the refusal by the Vencare Five to see patients was unprotected by the Act for two reasons: (1) it was a partial strike; and (2) the group failed to

give advance notice of the work stoppage, as required of employees at a health care institution by Section 8(g) of the Act. Petitioner further argues that since the work stoppage was unprotected, it was lawful for it to terminate the employees for their refusal to see patients. Respondent argues that substantial evidence supports the Board's finding that the work stoppage was protected. We find that the employees engaged in an unprotected partial strike and that their discharge was lawful.[9] Therefore, we do not reach the question of whether the Vencare Five constituted a labor organization that was required to give a 10 day notice before striking a health care employer.

Section 7 of the Act protects "not only concerted activity under the sanction of a labor union, but also concerted activity of the same nature engaged in by unorganized employees." *Vic Tanny Int'l, Inc. v. NLRB*, 622 F.2d 237, 241 (6th Cir. 1980). However, "not...all work stoppages are federally protected concerted activities." *Auto Workers Local 232 v. Wisconsin Employment Relations Bd.*, 336 U.S. 245, 255 (1949), *overruled on other grounds by Lodge 76, Int'l Ass'n of Mechanists & Aerospace Workers*, 427 U.S. 132 (1976). While employees may strike to "protest and seek to change any term or condition of their employment," thus assuming the risk of losing their jobs, they may not strike and retain the benefits of working at the same time. *First Nat'l Bank of Omaha*, 171 N.L.R.B. 1145, 1151 (1968), *enforced*, 413 F.2d 921 (8th Cir. 1969). Partial strikes, where employees continue working on their own terms, are therefore unprotected by Section 7 of the Act. *Id.* at 1149-51; *Valley City Furniture*, 110 N.L.R.B. 1589, 1594 (1954), *enforced*,

---

**9**We accordingly do not address the issue of reinstatement and back pay, including the question of whether two of the five employees quit before they were told they were fired. We also do not address Petitioner's argument that it was never advised that the Vencare Five engaged in a strike.

230 F.2d 947 (6th Cir. 1956). Employees, thus, may not "refuse to work on certain assigned tasks while accepting pay or while remaining on the employer's premises." *Audubon Health Care Ctr.*, 268 N.L.R.B. 135, 136 (1983) (finding that nurses engaged in a partial strike when they refused to perform some of their job functions while performing others). They may, however, engage in a single walkout. *Daniel Constr.*, 277 N.L.R.B. 795 (1985).

The ALJ concluded that the Vencare Five did not engage in a partial strike. In its opinion,

> The General Counsel correctly characterize[d] the "old patient" paperwork performed after the group's announcement to Stuart as incidental wind-up work done in preparation for their work stoppage regarding new patients. Moreover, the Vencare Five told Stuart that they did not expect to be paid for this paperwork and immediately left the premises when Stuart told them to do so after lunch on June 23...Lastly, the employees did not "pick and choose" when they would perform their work duties by announcing either a 24-hour or few days' delay in seeing patients...Rather their action was simply a short-term, single work stoppage-the first of its kind-whose only goal was to obtain a meeting with management.

*Vencare Ancillary Servs., Inc.*, 334 N.L.R.B. No. 119, 2001 WL 910767, at *17 (Aug. 6, 2001) (decision of the ALJ). The Board agreed with the ALJ and found that "any work done after the group announced that they were refusing to see patients, was done in preparation for, and in conjunction with the work stoppage." *Vencare*, 2001 WL 910767, at *9. The Board continued to say:

> In reaching this conclusion, we find it unnecessary to determine the percentage of time the employees normally spent performing paperwork, or the percentage of billable

time attributable to paperwork. The judge found that the employees' paperwork function took up to 10 to 20 percent of their time and approximately 40 percent of their billable time. However, the testimony in this regard was ambiguous, (particularly with respect to the 40 percent figure), or was given in response to leading questions, and the exhibits do not clearly support the testimony. For the reasons discussed below, *we find that, regardless of the percentage of time the employees normally spent on or billed for paperwork, the fact that they performed paperwork while waiting to hear back from upper management did not render their work stoppage an unprotected partial strike.*

*Id.* at *9 n. 14 (emphasis added).

We find that the ALJ and the Board erred in concluding that the actions of the Vencare Five did not constitute a partial strike. Unlike the Board, we find that it is significant that the Vencare Five did *some* work after making their demands known. As the Board noted in an earlier case, "the Board and the courts have repeatedly condemned employees' refusal to work on the terms lawfully prescribed by the employer while remaining on their jobs." *Highland Hosp. Corp.*, 278 N.L.R.B. 1097 (1986) (finding that the security guards engaged in a partial strike when they failed to perform some of their functions during a strike by the hospital employees); *See also N.L.R.B. v. Local Union No. 1229*, 346 U.S. 464, 476 n. 12 (1953) ("An employee can not work and strike at the same time. He can not continue in his employment and openly or secretly refuse to do his work.") (citations omitted). It is true that had the Vencare Five simply remained on the premises and waited to hear back from the management, they

might have been protected under the current law.[10] They did not, however, do that. *See, e.g., Highland Hosp.*, 278 N.L.R.B. at 1097 (drawing a distinction between the security guards who stated they would not perform certain duties and "the office clerical and other nonunit employees who joined the strike [,] ceased working completely[,] and refused to cross the picket line."); *Audubon*, 268 N.L.R.B. at 136 ("Having concluded that covering open sections was part of the nurses aides' job duties, we find that the aides were engaged in a partial strike when they refused to work in the open section. Thus, they did not completely walk off the job.") The Board's opinion that their conduct is commendable since they actually behaved responsibly is legally irrelevant. *See, e.g., Audubon*, 268 N.L.R.B. at 137 ("While employees may protest and ultimately seek to change any term or condition of their employment by striking or engaging in a work stoppage, the strike or stoppage must be

---

[10]Respondent's discussion of cases involving sit-down strikes is therefore misplaced. All the cases cited in its brief involved situations where the striking workers remained on the premises *without* working. *See, e.g., City Dodge Ctr., Inc.*, 289 N.L.R.B. 194, 196-97 (1988), *enforced sub nom., Roseville Dodge, Inc. v. NLRB*, 882 F.2d 1355 (8th Cir. 1989) (complete work stoppage protected even though employees remained on employer's premises). Their failure to work therefore provided their employers with a clear indication of a strike. The issue in those cases was not whether or not employees engaged in a partial strike, but rather, *assuming* that a strike was a complete one, whether or not their conduct should be protected by the Act. *See, e.g., Yale Univ.*, 330 N.L.R.B. 246, 257 (1999) ("Not every work stoppage is protected activity, however; at some point, an employer is entitled to assert its private property rights and demand its premises back."). By citing these cases, Respondent merely confuses the issue by ignoring the clear difference between partial strikes and sit-down strikes. Although both types of strikes constitute an unprotected activity, they raise different concerns and should not be evaluated similarly. *First Nat'l Bank of Omaha*, 171 N.L.R.B. at 1149 ("There are cases which hold that the concerted activity of employees in refusing to work on assigned tasks [1] while accepting pay *or* [2] while remaining on the employer's premises is unprotected.") (emphasis added).

complete, that is, the employees must withhold all their services from their employer."); *Yale University*, 330 N.L.R.B. at 247 (finding that the graduate teaching fellows engaged in a partial strike when they refused to submit their students' final grades for the semester to the University but continued writing letters of evaluation and recommendation for their students). The underlying rationale of the prohibition on partial strikes is that the employer has a right to know whether or not his employees are striking. *See Vic Koenig Chevrolet*, 263 N.L.R.B. 646, 650 (1982) (finding that "a struck employer is entitled to a clearcut decision from employees either to join the strike or to work in accordance with the instructions of the employer, including performance of struck work, so long as the employer does not discriminate against employees unwilling to perform the work of the strikers."). The conduct exhibited by the Vencare Five does not meet the clear definition of a protected strike. *Yale Univ.*, 330 N.L.R.B. at 247 (affirming the ALJ's finding that the teaching fellows who refused to submit grades while writing recommendation letters "sought to bring about a condition that would be neither strike nor work.") (quoting *Valley City*, 110 N.L.R.B. at 1595). The Board had clearly articulated a long time ago why the Vencare Five's decision to stop seeing patients while performing other duties is an unprotected activity:

> Employees may protest and seek to change any term or condition of their employment, and their ultimate sanction is the strike. . .What may make such a work stoppage unprotected is exactly what makes any work stoppage unprotected, that is, the refusal or failure of the employees to assume the status of strikers, with its consequent loss of pay and risk of being replaced. Employees who choose to withhold their services because of a dispute over scheduled hours may properly be required to do so by striking unequivocally. They may not simultaneously walk off their jobs but retain the benefits of working.

*First Nat'l Bank of Omaha*, 171 N.L.R.B. at 1151.[11] We understand that the Vencare Five were upset over the impending wage cuts. They decided to "flex their muscles" by withholding patient care, the major function of their jobs. The Board implies that they were doing work necessary for the protection of patients. However, there was no evidence that any of the performed work fell into the category of protecting the patients. Furthermore, there were no other exigent circumstances that required the striking employees to continue some work to avoid irreparable harm.[12] The employees testified that they merely caught up on back paperwork which, in some cases, was several weeks old, as well as helped the clerical staff with filing.

We reiterate that employees must *completely stop* working or risk being discharged for engaging in an unprotected activity. There will always be conflicts between employers and employees, and the employees will often resort to

---

[11] Petitioner and Respondent argue about the legal relevance of the Vencare Five's expectation that they would not be paid for June 23. In light of the Fair Labor Standards Act's requirement that employees be paid for any time they are "suffered or permitted to work," regardless of whether the employees ask or expect to be paid, we agree with Petitioner that employees' expectations about being paid are not relevant to the question of whether there was a partial strike. 29 CFR § 785.11 ("For example, an employee may voluntarily continue to work at the end of the shift. He may be a pieceworker, he may desire to finish an assigned task or he may wish to correct errors, paste work tickets, prepare time reports or other records. The reason is immaterial.")

[12] *See, e.g., NLRB v. Reynolds & Manley Lumber Co.*, 212 F.2d 155 (5th Cir. 1954) (employee walked off the job and left a potentially explosive boiler unattended); *U.S. Steel Co. v. NLRB*, 196 F.2d 459 (7th Cir. 1952) (supervisors refused to assist their employer in maintaining and protecting the steel plant from imminent danger and destruction during strike period); *Marshall Car Wheel & Foundry Co.*, 107 N.L.R.B. 314 (1943), *enf. denied*, 218 F.2d 409, 413 (5th Cir. 1955), *supplemented,* 115 N.L.R.B. 7 (1956) (employee walkout happened at the moment molten iron was ready to be poured).

withholding their work as means of applying pressure on the employers. The employers will often respond by replacing the striking workers. Although we are sympathetic to the plight of the Vencare Five, who appear to have no knowledge of the labor law, we are constrained to find that the harsh result in this case is a consequence of a Congressional policy designed to protect both the employer and the employee. *See, e.g.*, *Vic Koenig Chevrolet*, 263 N.L.R.B. at 650 (finding that a "young, inexperienced, very likely unknowledgeable about labor relations" lot boy nevertheless engaged in an unprotected partial strike when he failed to perform some of his duties).

## CONCLUSION

In sum, we conclude that the employees engaged in an unprotected strike and were therefore lawfully discharged by Petitioner. Enforcement of the Board's order is denied.