File Name: 06a0737n.06

Filed: October 5, 2006

**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

**Nos. 05-1660, 05-1735**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| NATIONAL LABOR RELATIONS BOARD, | ) | |
| | ) | |
| Petitioner/ | ) | |
| Cross-Respondent, | ) | |
| | ) | ON APPEAL FOR ENFORCEMENT OF |
| v. | ) | AN ORDER OF THE NATIONAL LABOR |
| | ) | RELATIONS BOARD |
| PROMEDICA HEALTH SYSTEMS, INC., | ) | |
| THE TOLEDO HOSPITAL, and TOLEDO | ) | |
| CHILDREN'S HOSPITAL, | ) | |
| | ) | |
| Respondents/ | ) | |
| Cross-Petitioners. | ) | |

Before: RYAN and COOK, Circuit Judges; and GWIN, District Judge.[*]

COOK, Circuit Judge. The National Labor Relations Board (the "Board") petitions for

enforcement of its order requiring Respondents ProMedica Health Systems, Inc., The Toledo

Hospital, and Toledo Children's Hospital (collectively "ProMedica"), to cease and desist from

violating the National Labor Relations Act (the "Act"), 29 U.S.C. §§ 151 et seq., and to take various

---

[*]The Honorable James S. Gwin, United States District Judge for the Northern District of
Ohio, sitting by designation.

affirmative remedial measures.[1] ProMedica cross-petitions for review of the same order.[2] We grant

the cross-petition for review in part and grant the petition to enforce the order in part.

## I. Background

ProMedica operates several hospitals and related facilities in the Toledo area. In early 2000,

the Union began organizing efforts at several of these facilities. ProMedica decided to oppose the

Union's organizing efforts and toward that end hired consultants to provide labor-relations training

to its managers and supervisors.

A few months later, the Union filed unfair labor practice charges with the Board against

ProMedica. The Board issued a "Complaint and Notice of Hearing," based on these charges (the

"Summer 2000 charges"), alleging that ProMedica violated the Act by, among other things,

selectively and disparately enforcing its "no-solicitation/no-distribution" policy, discriminatorily

disciplining ("coaching") employees based on their union-related activities, creating the impression

of surveillance among its employees, and unlawfully threatening its employees.

---

[1]Specifically, the Board ordered ProMedica to remove references to unlawful disciplinary actions taken against certain employees from its files, to pay damages to employees for any loss suffered as a result of discrimination, to post copies of ProMedica's violations at its facilities, and to certify that it had complied with the order.

[2]International Union, United Automobile, Aerospace and Agriculture Implement Workers of America, UAW (the "Union") intervened in support of the Board.

Before a hearing was held on the Summer 2000 charges, the Union filed four representation petitions for employees working at ProMedica facilities. The Board then conducted elections, and the Union failed to garner a majority of the votes in any of the facilities.

Following the elections, the Union filed additional unfair labor practice charges (the "election charges") and several election objections[3] based on ProMedica's conduct during the pre-election period. Many of the election charges were withdrawn or settled, and eventually the Board ordered a hearing on the remaining election charges and objections, consolidated with the Summer 2000 charges. The Board amended the complaint accordingly, adding allegations that ProMedica, in violation of the Act, promised employees that they would receive wage raises but later told them that the raises were being rescinded because the Union filed a representation petition.

An administrative law judge ("ALJ") held a hearing and issued a decision sustaining in part and dismissing in part the charges and recommending that ProMedica be ordered to cease and desist from the conduct found to be unlawful and to take certain affirmative remedial action. ProMedica filed exceptions to the ALJ's decision, and the Board's General Counsel filed cross-exceptions. The Board, with one member partially dissenting, "affirm[ed] the [ALJ's] rulings, findings, and conclusions and . . . adopt[ed] the recommended Order," with some modifications. ProMedica refused to comply and the Board petitioned this court for enforcement of its order. ProMedica cross-petitioned for review.

---

[3]Matters related to the election objections are not part of this appeal.

II. Standard of Review

Under the Act, the scope of our review of is limited. *Vencare Ancillary Servs., Inc. v. NLRB*, 352 F.3d 318, 321 (6th Cir. 2003) (citation omitted). Specifically, "[t]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e). "Evidence is considered substantial if it is adequate, in a reasonable mind, to uphold the decision." *Vencare*, 352 F.3d at 321 (quotation omitted). And although we "consider the evidence contrary to the Board's conclusions," we "may not conduct a *de novo* review of the record." *Id.* (quotations omitted). Similarly, the Board's application of the law to particular facts is reviewed under the substantial evidence standard, although we review the Board's conclusions of law de novo. *NLRB v. Good Shepherd Home, Inc.*, 145 F.3d 814, 816 (6th Cir. 1998) (citation omitted).

III. Discussion

A. Statutory Overview

Section 7 of the Act guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining." 29 U.S.C. § 157. Section 8(a)(1) of the Act makes it an "unfair labor practice" for any employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7]," 29 U.S.C. §

158(a)(1), and Section 8(a)(3) of the Act makes it an unfair labor practice for an employer to discriminate "in regard to . . . any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

## B. The Summer 2000 Charges

The complaint, in relevant part, alleges that ProMedica violated Section 8(a)(1) and (a)(3) of the Act by: selectively and disparately enforcing its "no-solicitation/no-distribution" policy (the "Policy"); discriminatorily disciplining several Union supporters because of their pro-Union activities; creating the impression that employees' union activities were under surveillance; and unlawfully threatening employees with reprisals.

## 1. Disciplinary Action

ProMedica argues that because coachings are not discipline they do not affect any term or condition of employment, *see Lancaster Fairfield Cmty. Hosp.*, 311 NLRB 401, 403-404 (1993) (finding that a "warning" issued to an employee was not "formal discipline," and thus did not affect "any term or condition of employment" within the meaning of the Act). Alternatively, they argue that the record does not support the finding that it disparately enforced the Policy. We disagree with both contentions.

ProMedica maintains a progressive disciplinary system, which includes employee recognitions, "coachings," and formal levels of discipline. Though ProMedica points to several

subtle distinctions between coachings and "formal discipline," we find that coachings are plainly part of ProMedica's disciplinary scheme because warnings that "lay[ ] a foundation for future disciplinary action" against employees are part of an employer's disciplinary scheme. *Trover Clinic*, 280 N.L.R.B. 6, 16 (1986).

Unlike *Lancaster*, where there was no evidence that the warning issued by the employer was "part of the [employer's] formal disciplinary procedure or . . . even a preliminary step in the progressive disciplinary system," 311 N.L.R.B. at 403-04, here, substantial record evidence supports the finding that, as in *Trover Clinic*, ProMedica's coachings can and do form the "foundation for future disciplinary action." Two of ProMedica's human resources managers testified that past coachings are considered as a factor when deciding whether to issue formal discipline against an employee for later rules infractions. Moreover, ProMedica's own policy explains that coachings "can be a very effective means of solving performance problems. However, when an employee fails to respond to counseling, formal levels of discipline may be initiated." Accordingly, we conclude that the issuance of coachings constitutes disciplinary action.

We next turn to ProMedica's argument that it did not disparately enforce the Policy. In relevant part, the Policy (1) prohibits employees from soliciting "for funds, memberships or individual enlistment in outside organizations or causes at all times on work time and in immediate patient care areas"; (2) prohibits the "distribution of literature and other materials for any purpose

. . . during working time"; and (3) permits solicitation and distribution "during non-working time in all non-working areas of the facility that are not immediate patient care areas."

That the parties agree the Policy is facially valid is of no moment because, as a general matter, when an employer has been lax in its enforcement of a valid no-solicitation/no-distribution rule with respect to non-union-related activity, "enforcement of the no solicitation rule so as to prohibit employees from [engaging in union-related solicitation or distribution], violates Section 8(a)(3) and (1) of the Act." *Meijer, Inc*., 318 N.L.R.B. 50, 57 (1995) (citing *Action Auto Stores*, 298 N.L.R.B. 875 (1990)); *see also NLRB v. St. Francis Healthcare Ctr.*, 212 F.3d 945, 961 (6th Cir. 2000); *NLRB v. Daylin, Inc., Discount Div.*, 496 F.2d 484, 488 (6th Cir. 1974); *Clinton Elec. Corp.*, 332 N.L.R.B. 479, 501 (2000) (finding employer violated the Act by selectively and disparately enforcing its valid no-solicitation rule by applying the rule against solicitations by labor organizations, while disregarding other types of solicitations).

The record is replete with evidence that ProMedica's enforcement was lax with respect to non-union-related solicitation and distribution. The ALJ credited numerous employees' testimony describing the widespread and open non-union-related solicitation for and distribution of various commercial and charitable products—Tupperware, Avon cosmetics, and Girl Scout Cookies, for example. The employees also testified that books and catalogues offering these products were commonly left lying around work areas, including "patient care areas" (such as the nurses' station). One employee, Cynthia Miller, testified that her supervisor was commonly at the nurses' station and

would have been able to see the brochures and catalogues left in the open. And another employee, Christine Gallagher, testified that people "basically walk[ed] around . . . with an order form saying, 'Do you want to buy some cookies?'."

ProMedica directs our attention to deposition testimony from its supervisors and managers in an effort to demonstrate that it consistently enforced the Policy with respect to non-union solicitations and distributions. But ProMedica's argument misses the mark. The case does not turn on how many times ProMedica enforced the policy, but on whether ProMedica consistently enforced the policy in general. ProMedica's evidence demonstrates limited enforcement efforts, and given that the ALJ's finding that "solicitations and distributions were 'commonplace,'" the evidence is adequate to uphold the lax enforcement conclusion and meets our substantial evidence test.

ProMedica also contends that there is no evidence that it intentionally ignored non-union-related violations of the Policy. But the ALJ specifically discredited ProMedica's "denials of knowledge or its claims that it assiduously and diligently enforced the policy uniformly."[4] And the Board's decision could survive even without direct evidence that ProMedica's supervisors and managers ignored non-union-related violations of the Policy. Such testimony would strengthen the case, but the ALJ's finding that non-union solicitations and distributions were "commonplace" supports the inference that Promedica had actual knowledge of the selective enforcement. *See South*

---

[4]In its decision, the Board "examined the record and [found] no basis for reversing" any of the ALJ's credibility determinations. ProMedica does not challenge this conclusion.

*Nassau Cmtys. Hosp.*, 274 N.L.R.B. 1181, 1182 (finding that an employer disparately enforced its no-solicitation rule "[e]ven in the absence of direct testimony that supervisors observed [the non-union-related] transactions" because the widespread solicitation by employees justified an inference that the employer had knowledge). Thus, substantial evidence supports the finding that ProMedica was aware of the significant volume of non-union-related solicitation/distribution and selectively and disparately enforced the Policy in violation of the Act.

We accordingly agree with the Board's conclusion that ProMedica violated Section 8(a)(3) of the Act by discriminatorily issuing coachings to the five employees named in the complaint for engaging in pro-union-related solicitation or distribution after the Union announced its intention to organize. We find it unnecessary to recount the specific facts that led to each employee's coaching because, though the facts vary slightly, each complaining employee essentially testified that he or she received coachings for engaging in pro-Union activities that violated the Policy while ProMedica generally ignored non-Union-related violations.

When an employer's opposition to union activity motivates its decision to take adverse action against an employee, the employer will be found to have violated Section 8(a)(1) and (3) of the Act unless it can demonstrate by a preponderance of the evidence that it would have taken the same actions absent the protected conduct. *See, e.g.*, *NLRB v. Oberle-Jordre Co.*, 777 F.2d 1119, 1120 (6th Cir. 1985) (finding employer violated Section 8(a)(1) and 8(a)(3) by discharging an employee because of union membership).

Here, the ALJ found that the Board's General Counsel established a prima facie case of discrimination. *See NLRB v. Gen. Fabrications Corp.*, 222 F.3d 218, 226 (6th Cir. 2000) ("'Discriminatory motivation may reasonably be inferred from a variety of factors, such as the company's expressed hostility towards unionization combined with knowledge of the employees' union activities; . . . disparate treatment of certain employees compared to other employees with similar work records or offenses; a company's deviation from past practices in [taking the adverse action]; and proximity in time between the employees' union activities and [the adverse action].'" (quoting *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 871 (6th Cir. 1995))); *see also NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393 (1983); *Wright Line*, 251 N.L.R.B. 1083 (1980). Because ProMedica cannot demonstrate by a preponderance of the evidence that it would have taken disciplinary action against the complaining employees absent the protected conduct, we agree, with one exception noted below, that ProMedica violated Section 8(a)(1) and 8(a)(3) of the Act by issuing the challenged coachings.

We are not persuaded by ProMedica's argument that, even if it knowingly permitted "isolated" non-union related solicitations and distributions, it did not violate the Act by enforcing the Policy against three employees (Dea Lynn Keckler, Cynthia Miller and Robert Hasenfratz), because they solicited for the Union in patient care areas. *See S. Maryland Hosp. Ctr. v. NLRB,* 801 F.2d 666, 674 (4th Cir. 1986) ("The Board submits that [because raffle tickets, Girl Scout cookies and cosmetics were sold by employees without reproach] this proves discriminatory application of the rule. However, to follow the Board's reasoning to its logical conclusion, the fact that the hospital

had allowed some innocuous activity to go unpunished in the past would mean that *any* subsequent attempt by the hospital to control union solicitation in its patient care areas would have amounted to an unfair labor practice. The care of patients is too important to allow such a result."). This circuit's precedent conflicts with the Fourth Circuit's rule. *See Mt. Clemens Gen. Hosp. v. NLRB*, 328 F.3d 837, 848 (6th Cir. 2003) (holding that a hospital violated the Act by enforcing its rule prohibiting the wearing of union pins in patient-care areas where hospital had allowed employees to wear similar pins while caring for patients in the past, and the hospital could not justify its position that wearing union buttons would interfere with patient care).

We cannot agree, however, with one aspect of the Board's decision as it relates to the coachings. Robert Hasenfratz, a registered nurse at Flower Hospital and an open supporter of the Union's organizing efforts, was coached twice for violating the Policy. His supervisor, Barbara Staccone, issued the second coaching after another manager informed her that an employee, Don Griffin, filed a report complaining that Hasenfratz harassed and intimated him in the hospital parking lot about signing a union authorization card. Hasenfratz denied the charge, but Staccone issued a coaching based on the information provided to her.

The ALJ found that ProMedica violated the Act by coaching Hasenfratz for engaging in union-related solicitation and rejected ProMedica's argument that the coaching was lawful because it was based on Hasenfratz's harassment and intimidation of Griffin. The ALJ found that because Staccone "accepted [Griffin's report] at face value," without interviewing Hasenfratz personally,

ProMedica simply took advantage of Griffin's claim in order to interfere with Hasnefratz's Union-related activities.

But as ProMedica persuasively argues, the ALJ discounted the investigation undertaken by Robert Czyzewski, the hospital's security supervisor. Czyzewski testified that after hearing of the incident he went to the parking lot to speak with Hasenfratz, encountered Hasnefratz in the parking lot soliciting for the Union (which was permissible because Hasenfratz was off-duty and in a non-work area), and asked Hasenfratz about the "Griffin incident," to which Hasenfratz responded, "Nothing happened." Czyzewski testified that he then spoke to Griffin to confirm the contents of Griffin's written statement about the incident. Czyzewski prepared a written report, which he sent, along with Griffin's written statement, to Human Resources. After seeing the reports, Sandra Fiock (the Human Resources Manager) testified that she then contacted Staccone and directed her to contact Hasnefratz and to coach him regarding this situation, which Staccone did.

The ALJ erroneously concluded that "Czyzewski elected not to interview Griffin," and faulted Staccone and Fiock for not interviewing him, commenting that if they had "bothered" to interview Griffin again, "as opposed to relying on hearsay hysterics," then "perhaps Hasnefratz would not have been counseled at all." Neither the Board nor the Union briefing supports the notion that such a "reinvestigation" would have been necessary, given the investigation Czyzewski performed.

Given the evidence of ProMedica's investigation of the incident in advance of its issuing Hasenfratz a formal coaching based on what it determined to be Hasenfratz's harassing and intimidating behavior—behavior the Board does not argue is protected—we grant the cross-petition for review with respect to Hasenfratz's second coaching. And we grant the petition to enforce the remainder of the disciplinary issues contained in the order.

### 2. Creating an Impression of Surveillance

"An employer who creates the impression that its employees' union activities are under surveillance violates Section 8(a)(1) of the Act." *NLRB v. Benteler Indus.*, No. 97-5588, 1998 U.S. App. LEXIS 15139, at *16 (6th Cir. July 1, 1998) (citing *NLRB v. Aquatech*, 926 F.2d 538, 544 (6th Cir. 1991). The Board's test for determining whether an employer has created an impression of surveillance asks "whether the employee would reasonably assume from the statement in question that his union activities had been placed under surveillance." *Tres Estrellas do Oro*, 329 N.L.R.B. 50, 51 (1999); *United Charter Serv.*, 306 N.L.R.B. 150 (1992). The test does not look at the subjective belief of the employee. *MTD Prods., Inc.*, 310 N.L.R.B. 733, 742 (1993).

The ALJ found that ProMedica unlawfully created the impression that Hasenfratz's and fellow-employee Billie Smith's union activities were under surveillance. With respect to Hasenfratz, a divided Board found that Hasenfratz could reasonably conclude that his union activities were under surveillance because: 1) he received his first coaching only a short time after his name and pro-union statements appeared in a local newspaper article; 2) ProMedica refused to disclose the name of the

person accusing Hasenfratz of violating the Policy; and 3) ProMedica "undertook little or no investigation." The Board relied primarily on *Avondale Industries*, 329 NLRB 1064 (1999):

> A supervisor's calling an employee away from other employees and then telling him that his prounion sympathies were known, *but refusing to tell the employee, when asked, how that knowledge was gained, is an action designed to convey to that employee that the information was gained by stealth, and unlawful means, not observation of open and obvious activity (such as [employee's] bumper sticker)*. . . . It violat[es] Section 8(a)(1), [by] creat[ing] the impression of surveillance in an employee.

*Id.* at 1265 (emphasis added).

Here, as with the employee in *Avondale*, Hasenfratz openly engaged in pro-union activities. But because his supervisor (Staccone) refused to disclose the source of her knowledge—only telling Hasenfratz that a complaint had been filed—she conveyed the message that she obtained the information by stealth and thus created the impression of surveillance, leaving "undispelled the inference that the source of the complaint was a member of management or an employee recruited to spy on Hasenfratz's union activity." That Staccone told Hasenfratz that a complaint had been filed whereas the employer in *Avondale* did not is a distinction without significance. We do not believe, as ProMedica argues, that "any reasonable employee would understand that [ProMedica was] simply protecting the confidentiality interests of the complainer." Likewise, that Hasenfratz's pro-union comments were published in a newspaper article is not a meaningful distinction because the employee in *Avondale* was also an open union supporter.

- 14 -

Given our decision to enforce this portion of the Board's order, we find it unnecessary, as did

the majority of the Board, to pass on the other allegations of creating an impression of surveillance.[5]

We grant the petition to enforce the order with respect to the surveillance issue.

### 3. Threats of Reprisal

An employer violates Section 8(a)(1) of the Act by threatening employees with reprisals for

engaging in protected activity. *Wilkie Co. v. NLRB*, 55 Fed. Appx. 324, 327 (6th Cir. 2003) (citing

*NLRB v. Okun Bros. Shoe Store, Inc.*, 825 F.2d 102, 105-06 (6th Cir. 1987). "The test for

determining whether an employer's [statement or conduct constitutes an unlawful threat is whether

the statement or conduct] tends to be coercive or tends to interfere with the employees' exercise of

their rights." *Okun Bros.*, 825 F.2d at 105. This is an objective test, requiring the Board to consider

the total context in which the challenged conduct occurs; and the Board is justified in viewing the

issue from the standpoint of its impact upon the employees. *Id.*

The ALJ found, and the Board agreed, that ProMedica threatened two of its employees,

Billie Smith and Marjorie Smith. Billie Smith, a housekeeper at Flower Hospital, was quoted in the

same newspaper article that quoted Hasenfratz as favoring the Union. A week later, Billie was called

into the office of Gerald Fletcher, Flower's Director of Environmental Services, where Billie's

---

[5]As part of the remedy, ProMedica was ordered to cease and desist from "[c]reating the impression among their employees that their union activities were under surveillance," and was ordered to post a notice to this effect "in conspicuous places." ProMedica was not required to specifically name any employees as part of the order, and accordingly, so long as there is one instance of surveillance the remedy will be unaffected by findings of additional violations.

immediate supervisor, Joyce Wilkerson, was also present. Fletcher told Billie that an unnamed

source complained that she had solicited for the Union while on the job. Billie denied soliciting, but

admitted she had talked with other employees about the Union while working. Fletcher then coached

Billie and told her to converse with other employees during non-working time only because he "did

not want to see her get into any trouble."

We agree that Fletcher's warning not to talk to other employees on the job about the Union

constituted an implied coercive threat. As the ALJ noted, Fletcher and Billie had little contact with

each other prior to their meeting (Fletcher was not Billie's immediate supervisor), and the ALJ

discredited Fletcher's testimony that he was "only looking out for his employees." Given the

circumstances surrounding Fletcher's statements—a high-level supervisor meeting with an employee

whom he does not know well, where the supervisor coaches the employee based on an anonymous

complaint about the employee's solicitation for the Union—and given that the ALJ discredited

Fletcher's testimony, we find that substantial evidence supports the finding that from Billie's

standpoint, Fletcher's statements were coercive and thus that ProMedica violated Section 8(a)(1) of

the Act.

The ALJ also found that Kerry Loe, Toledo Hospital's patient care supervisor, made coercive

statements to Marjorie Smith. But because it is unclear whether ProMedica properly challenged this

finding,[6] and because additional violations will not affect the remedy,[7] we decline to reach this issue. We grant the petition to enforce the order with respect to this issue.

## C. The Election Charges

The Board found that ProMedica violated Section 8(a)(1) by inappropriately commenting on the likely impact that the Union election would have on a promised wage increase. We grant ProMedica's cross-petition for review of this issue, finding that substantial evidence does not support the Board's decision.

## 1. Events Surrounding the Wage Increase

Sean McClure, the acting director of ProMedica's clinical lab, noted the lab's unusually-high turnover rate and recruitment problems, and identified as a culprit the low salaries ProMedica paid to the lab's pre-analytical technicians ("PTs"). He reported his findings to ProMedica's compensation council, and the council agreed that a raise was in order. But ProMedica's executive council needed to sign off on the raise before it could be implemented.

---

[6]The Board's decision notes that "there are . . . no exceptions to the judge's recommendation to overrule Objection 23, which alleges that [ProMedica], through . . . Kerry Loe, made coercive statements to . . . Marjorie Smith," though it appears ProMedica did take exception to this finding in paragraph 77 of its "Exceptions to the ALJ's Decision" document filed with the Board.

[7]As with the surveillance charges, the Board ordered ProMedica to cease and desist from threatening employees. Accordingly, so long as there is one violation, any additional violations would only be cumulative and would not affect the remedy.

After meeting with the compensation council, but before the executive council acted, McClure asked for and received his supervisor's permission to tell the PTs "that the wage increase was being approved." He then instructed two ProMedica personnel, Gloria Florence and Wendy Purcell, "to tell the PTs that the wage increase had been approved."

After the Union filed its representation petitions, however, ProMedica worried that it could not lawfully implement the raise until after the election. McClure notified a PT Supervisor, Barbara Newman, that the raise was "on hold" until after the Union election and Newman relayed the message to the PTs. Similarly, McClure announced at a staff meeting that, on the advice of counsel, ProMedica was not granting the raise at this time, that the matter was with the lawyers, and that he was not sure what would happen.

Francis Walsh, ProMedica's medical director, spoke to about 50 employees and discussed the raise. He told the employees that the raise had been approved in principle, but could not be immediately implemented. He also informed them that, "upon completion of the organizing campaign, irrespective of whether the Union was accepted or rejected, the raise could be brought up again either to be implemented or to be part of the collective-bargaining process."

The ALJ found that ProMedica acted "in good faith and after careful consideration of the applicable law," but nevertheless concluded that ProMedica violated the Act because the employees "could reasonably conclude they now were not getting their promised wages because of the Union's

filing of the election petitions." The ALJ continued: "Walsh's statements could be interpreted by employees to mean that implementation of the increases would be vouchsafed by a union loss."

In affirming the ALJ by a two-to-one vote, the Board concluded that ProMedica violated the Act by implying that only a union defeat in the election could guarantee the implementation of the wage increase. Specifically, the Board relied on Walsh's statement that, after the election, "the raise could be brought up again either to be implemented or to be part of the collective-bargaining process."

## 2. Discussion

A violation of Section 8(a)(1) of the Act occurs "when substantial evidence demonstrates that the employer's statements, considered from the employees' point of view, had a reasonable tendency to coerce." *Dayton Newspapers, Inc. v. N.L.R.B.*, 402 F.3d 651, 659 (6th Cir. 2005). Employers violate this section if they promise benefits to employees for rejecting a union. *V & S ProGalv, Inc. v. NLRB*, 168 F.3d 270, 278 (6th Cir. 1999). A subsidiary rule is that employers may not "state that a previously announced wage increase will probably be lost if a union wins." *Pearson Educ., Inc. v. NLRB*, 373 F.3d 127, 131 (D.C. Cir. 2004) (agreeing with the Board that the employer engaged in coercive conduct by circulating a campaign flyer stating that a previously-announced ten-percent raise "was 'WHAT . . . YOU HAVE TO LOSE if the Union wins the election'" and noting that the flyer "'explicitly state[d] that the promised wage increase [would] be put in jeopardy if the employees [chose] the Union'"). As the Board noted, "statements . . . convey a threat of loss of

existing benefits if they reasonably 'leave employees with the impression that what they may ultimately receive depends upon what the union can induce the employer to restore.'" (NLRB Dec. at 3 (quoting *Earthgrains Co.*, 336 NLRB 1119, 1119-20 (2001)). On the other hand, employers may permissibly notify employees that, if the union were to win an election, "negotiations would start 'from zero' or 'from scratch.'" *NLRB v. St. Francis Healthcare Centre*, 212 F.3d 945, 956 (6th Cir. 2000). The appropriateness of such a statement depends on "the timing of the statement, the opportunity of the union to respond, and the content of the union's responses." *Id.*

The parties acknowledge that an employer may properly delay a wage increase under certain circumstances, *see Sara Lee Bakery Group, Inc. v. NLRB*, 61 Fed.Appx. 1, 11 (4th Cir. 2003), and here the Board took issue not with ProMedica's delay in implementing the raises but with the statements that ProMedica made in explaining the delay. The Board was concerned that Dr. Walsh's statements conveyed the impression that "the PT wage increase could be in jeopardy if the employees selected union representation, but would be secure if the Union lost the election." We agree with ProMedica that the Board's finding lacks substantial evidentiary support. The immediate context of Walsh's statements belies the Board's conclusion that the statements would have a coercive effect on a reasonable employee. Walsh made clear ProMedica's desire to raise wages regardless of the electoral outcome. According to the Board,

> Walsh explained that a market adjustment of PT wages had been approved in principle by the hospital, but because of the Board's Rules, no raise could be implemented at this time. He added that, upon completion of the organizing campaign, *irrespective of whether the Union was accepted or rejected*, the raise

could be brought up again either to be implemented or to be part of the collective-bargaining process.

(Emphasis added.) The clear thrust of Walsh's comment was that, one way or another, ProMedica wanted to see the raise happen after the election. Walsh's brief explanation that the appropriate means of increasing wages post-election depended upon the outcome did not imply that ProMedica's *intentions* hinged on the outcome. His statements, viewed in context, could not have improperly influenced a reasonable employee and, as a result, did not violate the Act. Accordingly, we grant ProMedica's cross-petition for review on this issue and deny the Board's petition for enforcement.

## IV. Conclusion

For the foregoing reasons, we grant ProMedica's cross-petition for review with respect to the portions of the order finding that ProMedica violated the Act by issuing the second coaching to Hasenfratz and by making the "on-hold" announcement regarding the wage increase, and we grant the Board's petition for enforcement of the remainder of the order.