RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0177p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

HENDRICKSON USA, LLC.,

_Petitioner/Cross-Respondent_,

_v._

NATIONAL LABOR RELATIONS BOARD,

_Respondent/Cross-Petitioner_.

Nos. 18-1144/1315

On Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board;
No. 09-CA-159641.

Argued: May 2, 2019

Decided and Filed: August 1, 2019

Before: COOK, McKEAGUE, and WHITE, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Keith L. Pryatel, KASTNER WESTMAN & WILKINS, LLC, Akron, Ohio, for Petitioner/Cross-Respondent. Samuel Cretcher, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner. **ON BRIEF:** Keith L. Pryatel, KASTNER WESTMAN & WILKINS, LLC, Akron, Ohio, for Petitioner/Cross-Respondent. Samuel Cretcher, Linda Dreeben, Kira Dellinger Vol, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner.

McKEAGUE, J., delivered the opinion of the court in which COOK, J., joined. WHITE, J. (pp. 15–19), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

McKEAGUE, Circuit Judge.   When Hendrickson USA, LLC learned that employees were attempting to unionize one of its manufacturing plants, it began advocating against unionization.  A plant-wide letter cautioned employees that contract negotiations would begin "from scratch," and a PowerPoint shown to employees stated that "relationships suffer" in a union shop.   The National Labor Relations Board found that the company's statements constituted unfair labor practices because they coerced employees in the exercise of their rights under the National Labor Relations Act (NLRA) and ordered Hendrickson to post remedial notices around its plant.   Hendrickson petitioned this court for review, and the Board cross-appealed for enforcement of its order.   Because the Board's opinion is not supported by substantial evidence, we GRANT Hendrickson's petition and DENY the Board's cross-appeal.

**I**

Hendrickson owns an industrial plant in Lebanon, Kentucky, that produces truck suspension and axle systems.  On August 21, 2015, Hendrickson received a letter from a group of employees informing the company about the formation of a union organizing committee on behalf of United Steel Workers of America.  The company quickly responded with a campaign against unionization.  The same day the company received the letter, H.R. director Marlin Smith called a meeting to emphasize the company's "direct employee relationship strategy" and advised employees to read carefully any union-related documents before signing them.  A few days later, on August 24, plant manager Randy Lawless circulated a letter touting the company's current compensation package and taking issue with the idea that involving a third party would improve the relationship between the company and employees.  The letter cautioned employees that union representation would not guarantee an increase in compensation, stating that "[t]he Company and any recognized Union would begin the negotiation process from scratch."  Then, on August 25 and again on August 26, the company played a PowerPoint slideshow for all employees.  Over the course of forty slides, the presentation explained Hendrickson's negative view of unionization and strongly urged employees not to vote for unionization.  One of the

concluding slides opined that, when a plant unionizes, "the culture will definitely change," "relationships suffer," and "flexibility is replaced by inefficiency."

In September, a Hendrickson employee filed a charge with the Board, and the Board's General Counsel issued a complaint against Hendrickson, alleging that the company violated Section 8(a)(1) of the NLRA by threatening employees that authorization of a union would lead to loss of access to management and a more onerous work environment. The case went to a Board administrative law judge (ALJ), where the General Counsel added another claim, arguing that Hendrickson threatened employees with the loss of wages and benefits if they unionized. The ALJ rejected the General Counsel's allegation regarding statements about the loss of access to management but accepted the allegations regarding threats of an onerous work environment and threats of lower wages and benefits. The ALJ then ordered Hendrickson to cease communication in violation of the NLRA and post public notices about employees' rights under the NLRA.

Both Hendrickson and the General Counsel filed exceptions to the ALJ's opinion with the Board. The Board adopted the ALJ's opinion in full and added a footnote expressing the majority and dissenting statements of the three participating Members. Hendrickson has filed an appeal with this court, challenging the holdings that it unlawfully threatened employees with a more onerous work environment and lower wages and benefits. The Board has filed a cross-appeal asking for enforcement of its order.

## II

Our role in reviewing the Board's findings is limited. *See Vencare Ancillary Servs., Inc. v. NLRB*, 352 F.3d 318, 321 (6th Cir. 2003) (citation omitted). We must defer to the Board's findings of fact, reasonable inferences from the facts, and applications of law to the facts if they are supported by substantial evidence on the record considered as a whole. *Beverly Health and Rehab. Servs., Inc. v. NLRB*, 297 F.3d 468, 476, 478 (6th Cir. 2002) (citing 29 U.S.C. § 160(e)). Despite its name, "substantial evidence" is not an exacting standard—it means "more than a mere scintilla" and "only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotations omitted).

The deference of the substantial evidence standard is rooted in "the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 620 (1969) (citation omitted). On the other hand, "a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

## III

Section 7 of the NLRA guarantees employees the right "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing," and the right to refrain from those activities. 29 U.S.C. § 157. Under Section 8(a), it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of rights guaranteed in [Section 7]." 29 U.S.C. § 158(a)(1). On the other hand, under Section 8(c), "[t]he expressing of any views, argument, or opinion" by an employer is not an unfair labor practice as long as the expression "contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). This last section recognizes both the existence of and limits to an employer's right of free speech under the First Amendment. *See Gissel*, 395 U.S. at 617.

The enactment of Section 8(c) in 1947 "manifested a congressional intent to encourage free debate on issues dividing labor and management," and that policy judgment "favor[s] uninhibited, robust, and wide-open debate in labor disputes." *Chamber of Commerce of the U.S. v. Brown*, 554 U.S. 60, 67–68 (2008) (quotations omitted). Thus, in a labor dispute, both the employer and employees may "express themselves on the merits of the dispute in order to influence its outcome." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976) (citing *Gissel*, 395 U.S. at 617–18). On the other hand, the employer's right of free speech must be balanced with employees' right of free association, as "embodied in Section 7 and protected by Section 8(a)(1)." *Gissel*, 395 U.S. at 617. And a court's assessment of that balance "must be made in the context of [the] labor relations setting," where, because of employees' economic dependence on an employer, they may be more likely to sense intended threats than a disinterested observer. *Id.*

Distinguishing protected speech from unprotected threats can be difficult because "the only effective way of arguing against the union is for the company to point out to the workers the adverse consequences of unionization." *ITT Auto. v. NLRB*, 188 F.3d 375, 393 (6th Cir. 1999) (Kennedy, J., concurring in part and dissenting in part) (quoting *NLRB v. Village IX, Inc.*, 723 F.2d 1360, 1367 (7th Cir. 1983)). The Supreme Court has explained that the distinction between lawful advocacy and coercive threat turns on whether the employer communicates that predicted adverse consequences of unionization are "outside [the employer's] control" or instead "taken solely on [the employer's] own volition." *Gissel*, 395 U.S. at 619 (quotation omitted). In order to qualify as lawful advocacy, a prediction that adverse consequences will result "must be carefully phrased on the basis of objective fact." *Id.* at 618.

**IV**

**A**

The Board found that two of Hendrickson's statements constituted threats rather than lawful advocacy. The first statement at issue in this case is the comment in Hendrickson's letter that, if the plant were unionized, contract negotiations would begin "from scratch." The Board concluded that the statement was coercive, in violation of Section 8(a), because it threatened employees with the loss of wages and benefits if they authorized the union. We disagree.

Although the text of Section 8 and the Supreme Court's decision in *Gissel* provide the broader context for our analysis, the specific phrase "bargain from scratch" has been the subject of much litigation, and our analysis benefits from well-established precedent. We have held that the phrase is not a per se violation of the NLRA but that it "can be coercive, and therefore a violation of [Section 8], depending on the context of the statement." *NLRB v. Gen'l Fabs. Corp.*, 222 F.3d 218, 231 (6th Cir. 2000) (citing *TRW-United Greenfield Div. v. NLRB*, 637 F.2d 410, 420 (5th Cir. 1981)). The phrase is coercive if used to "indicate that the employer will adopt a regressive bargaining stance or lowered benefits to penalize workers for unionization," and it must be "viewed in the context of other statements or actions by the employer." *Id.* Thus, when an employer told employees that, "whenever you bargain with the Union, you start at zero, you don't start where you're at right now, you don't start with your existing wages, you don't start

with your existing benefits, you start at zero," we held that the statements were coercive in light of "the atmosphere of anti-union animus," which included other unfair labor practices such as termination of pro-union employees and threats to close the plant. *Id.* at 226–31.

On the other hand, we have also held that it is not unlawful for an employer to "adopt a hard bargaining posture if a union is elected" or to inform employees that it will do so, and that communicating an intent to start "from zero" or "from scratch" was a "permissible prediction of a hard bargaining posture." *NLRB v. St. Francis Healthcare Centre*, 212 F.3d 945, 956–57 (6th Cir. 2000) (citing *NLRB v. Gibraltar Indus., Inc.*, 653 F.2d 1091, 1096 (6th Cir. 1981)). But such a statement is coercive if it implies that the company will "reduce or eliminate benefits before bargaining beg[ins]." *Id.* at 957 (emphasis omitted). And whether the statement carries that implication depends in part on "the timing of the statement, the opportunity of the union to respond, and the content of the union's responses." *Id.* at 956 (citing *Automation & Measurement Div., Bendix Corp. v. NLRB*, 400 F.2d 141, 146 (6th Cir. 1968)). The statement must also be read in the context of other statements by the company, which may "remed[y] any possible coercive effect." *Id.* at 957. Thus, in *St. Francis* we determined that the Board's finding of coercion based on the phrase "start from scratch" was not supported by substantial evidence because the statements were made two months before the election and because pamphlets later distributed by the company explained that, while wages and benefits would remain the same during the bargaining process, employees could gain or lose as a result of the process. *Id.* at 957.

The Board has likewise held that, while "bargaining from scratch" is not a per se violation of the NLRA, it "is a dangerous phrase which carries within it the seed of a threat that the employer will become punitively intransigent in the event the union wins the election." *Coach & Equip. Sales Corp.*, 228 NLRB 440, 440–41 (1977). In general, the phrase is lawful when the company makes clear that it is warning employees about the natural give and take of the bargaining process, in order to counter the idea that unionization will automatically increase compensation. *Id.* On the other hand, the phrase is coercive when it indicates that the employer will retaliate against employees by adopting a "regressive bargaining posture" during negotiations or by "unilaterally discontinu[ing] existing benefits prior to negotiations," so that

employees receive only what the union can induce the company to restore.  *Id.; see also Stabilus, Inc. & UAW*, 355 NLRB 836, 855–56 (2010); *BP Amoco Chemicalfchocolate Bayou and Paper*, 351 NLRB 614, 617 (2007); *Wild Oats Markets, Inc. & Local 371*, 344 NLRB 717, 717–18 (2005); *In re Dillon Cos., Inc.*, 340 NLRB 1260, 1272 (2003); *Wagner Indus. Prods. Co.*, 170 NLRB 1413, 1413 (1968).  When the question is close, a "critical factor" in determining whether the statement has a "threatening color" is whether the context of the statement includes "contemporaneous threats or unfair labor practices."  *Coach & Equip. Sales Corp.*, 228 NLRB at 440–41; *see also BP Amoco*, 351 NLRB at 617; *In re Dillon Cos., Inc.*, 340 NLRB at 1272.

The Board concluded that Hendrickson's statement that contract negotiations would begin "from scratch" was coercive.  The August 24 letter in which the phrase appears first describes and praises the company's current benefits package, including healthcare and retirement benefits.  The following excerpt then appears:

> Some of you may feel, or have been told that Union representation will preserve job security, lead to greater benefits, or enhance compensation.  We have studied this issue closely and we respectfully disagree.  The fact of the matter is that a Union cannot promise you, as a valued employee of Hendrickson, anything.  IF our plant were to be unionized, and the collective bargaining process to begin, none of the benefits, compensation, or job security that you currently enjoy would be guaranteed.  The Company and any recognized Union would begin the negotiating process from scratch.  Which means all of the wages, benefits, and terms and conditions of employment that you currently enjoy at our plant would not be the starting point for negotiations toward a Union contract.

App'x at 45–46.  The record also shows that the slideshow Hendrickson presented to employees a few days later contained information about Hendrickson's Kendallville plant, which was already unionized, stating that news about wage and benefit increases after union negotiations "were only half the story" and pointing out that workers at the Lebanon location enjoyed benefits the Kendallville workers did not, such as 401(k) matching and higher life insurance coverage.  App'x at 82–84.

The Board's opinion finds that the letter "conveyed that if employees authorized a union at [the] facility, they would lose their current wages and benefits."  366 NLRB No. 7, *8.  In order to support its interpretation, the Board's opinion highlights the following facts.  First, the letter lists the current benefits package (presumably to show workers what they stand to lose).

Second, the letter "disagrees" that unionization will increase compensation. Third, the letter fails to clarify that the ultimate contract will be the product of the give and take of good-faith negotiations, a point that the Board presses in earnest on appeal. Therefore, the Board's opinion concludes that the letter "assured employees that they would begin bargaining with nothing" and "essentially promised that employees would lose some of their benefits and earnings as a result of any bargaining." *Id.* To restate the Board's conclusion in terms used by precedent, the Board found that Hendrickson was threatening employees that the company would retaliate by adopting a "regressive" bargaining posture during contract negotiations, so that employees would receive lower compensation than would result through good-faith negotiations. *See Gen'l Fabs. Corp.*, 222 F.3d at 231; *Coach & Equip Sales Corp.*, 228 NLRB at 441.

Despite the deference we owe to the Board's expertise in labor matters, we find that the Board's conclusion is not supported even by substantial evidence. While Hendrickson's letter does emphasize the inherent risks of contract negotiations, it does not "essentially promise" that employees will end up with less. The company makes clear that its statement is meant to counter any ideas that union representation would automatically lead to an increase in compensation, and that purpose is explicitly allowed under Board precedent. *See Coach & Equip Sales Corp.*, 228 NLRB at 441. As Hendrickson indicates in its letter, it "respectfully disagrees" that unionization would "preserve job security, lead to greater benefits, or enhance compensation." And the timing of the company's statement was not problematically close to any election—indeed, no election was ever scheduled—so the union would have had time to respond. *See St. Frances Healthcare Centre*, 212 F.3d at 957 ("The statement was made . . . almost two months before the election, giving the Union ample opportunity to respond.").

The Board's opinion and its brief on appeal make much of the fact that Hendrickson failed to explain that compensation would ultimately be determined based on the natural give and take of good-faith negotiations. But the lack of these specific phrases fails to provide substantial evidence that the company was threatening to adopt a regressive bargaining posture. The letter does make clear that employees are taking a risk in entering collective bargaining and that "all of the wages, benefits, and terms and conditions of employment" could be adversely affected. But the phrasing of the letter does not evince any intent on the part of company officials to adopt a

regressive bargaining posture in response to unionization. For comparison's sake, in *Coach & Equip. Sales Corp.*, a case on which the Board's opinion relies, a company official indicated that "he would start bargaining at the minimum wage level, that he *might* go up from that . . . but that he would *not* in any event go above what the employees were presently earning," which the Board concluded went beyond a description of the hazards of collective bargaining and indicated a determination to ensure that collective bargaining would definitely result in worse benefits. 228 N.L.R.B. at 441 (emphasis in original). In contrast, the letter in this case "respectfully disagree[s]" that union representation will necessarily increase compensation, but it does not evince a punitive determination to ensure a negative result. Furthermore, slides in the company's later presentation regarding its Kendallville location suggest that a union contract might improve some benefits while failing to sustain others—exactly the notion of "give and take" that the Board found was missing from the letter. This later PowerPoint material is relevant to show that employees would understand that negotiations involve a give-and-take process. *C.f. St. Frances Healthcare Centre*, 212 F.3d at 957 (observing that an employer's "own campaign literature distributed after August 6 obviated any threat to reduce or eliminate benefits before bargaining began").

Perhaps most importantly, the Board's conclusion is unsupported because, where the question is close, the presence of other threats and unfair labor practices is "critical" to determining whether the company's statements exude a "threatening color." *Coach & Equip. Sales Corp.*, 228 NLRB at 441; *see also Gen'l Fabs. Corp.*, 222 F.3d at 230–31; *In re Dillon Companies, Inc.*, 340 NLRB at 1272. The other facts of this case do not provide evidence of any such coercive environment. Far from punitive terminations of pro-union employees or threats of plant closure, *see, e.g.*, *Gen'l Fabs. Corp.*, 222 F.3d at 226–30, the only other potentially unfair labor practice in this case is a PowerPoint slide on which the company opined that, should employees authorize a union, "relationships suffer" and "flexibility is replaced by inefficiency." As we discuss below, we find these statements were likewise protected speech. Therefore, there was no record of unfair labor practices at Hendrickson's plant that would cast Hendrickson's letter in a threatening light.

**B**

The second issue in this case is whether Hendrickson violated the NLRA by stating on a PowerPoint slide that, should a union be authorized, "the culture will definitely change," "relationships suffer," and "flexibility is replaced by inefficiency." Two out of three Members agreed with the ALJ's opinion that these statements represented threats that the company would respond to union representation by changing management style and inflicting a more onerous work environment on employees. One Board Member dissented, arguing that the company's statements were protected speech.

Per the Supreme Court decision in *Gissel*, the main question is whether Hendrickson's statements about changing company culture were projections of consequences beyond its control or threats to retaliate against employees for authorizing union representation. *See Gissel*, 395 U.S. at 619. Hendrickson relies on the Board's decision in *Tri-Cast, Inc.*, 274 NLRB 377 (1985), to support its contention that the PowerPoint statements were describing consequences beyond its control. In *Tri-Cast*, an employer sent a letter to employees stating:

> We have been able to work on an informal and person-to-person basis. If the union comes in this will change. We will have to run things by the book, with a stranger, and will not be able to handle personal requests as we have been doing.

*Id.* at 377. The employer in *Tri-Cast* defended its letter by citing Section 9(a) of the NLRA, which states that union representatives are the exclusive representatives for bargaining over terms and conditions of employment and that, while individuals still have the right to individually present grievances to their employer, union representatives have the right to attend any such presentation. *See id.* at 377; 29 U.S.C. § 159(a). The Board concluded that the letter was not threatening, explaining:

> Section 9(a) thus contemplates a change in the manner in which employer and employee deal with each other. For an employer to tell its employees about this change during the course of an election campaign cannot be characterized as an objectionable retaliatory threat to deprive employees of their rights, but rather is nothing more or less than permissible campaign conduct. As the Ninth Circuit has observed, "[I]t is a 'fact of industrial life' that when a union represents employees they will deal with the employer indirectly, through a shop steward." *NLRB v. Sacramento Clinical Laboratory*, 623 F.2d 110, 112 (9th Cir. 1980).

*Tri-Cast, Inc.*, 274 NLRB at 377.  The employer also told employees that the company might "lose business" because "union restrictions" would cause the company to "lose the flexibility we need to ship [products]."  *Id.* at 378.  The Board again held that the company was entitled to "mention [the] possible effects of unionization," based on the fact that the union might bargain for restrictions on the "amount and types of work done by unit members."  *Id.*

Turning to the PowerPoint at issue, the title slide of the presentation indicated that the presentation would cover "Hendrickson's Direct Employee Relationship."  App'x at 48.  The next slide defines "direct employee relationship" as "working with our employees so that we are aware of, and responsive to, their ideas, issues and concerns."  App'x at 49.  The presentation also opined that direct relationships made sense to "achieve higher levels of employee morale, productivity, and efficiency" by eliminating "the need for employees to turn to a third party." App'x at 50.  The company also claimed that employees say they like to work at Hendrickson because of its "open door policy," "easy-going atmosphere," "freedom to do [the] job," and "reward/advancement for those that work hard and produce."  App'x at 53.  The company then points out that, per the text on an authorization card, workers would "lose the right to represent [themselves]," app'x at 64, which in turn would lead to the "loss of our direct employee relationship."  App'x at 65.  Finally, the statements at issue in this section were contained in one of the concluding slides:

> The culture will definitely change!
> - You'll be giving up your right to speak for and represent yourself.
> - Every change to wages, hours, and working conditions requires negotiations controlled by the union—not you.
> - Relationships suffer.
> - Flexibility is replaced by inefficiency.
> - It will cost you money.

App'x at 86.

The company also emphasized the effect of unionization on the employer-employee relationship in interactions outside the PowerPoint.  In the August 21 meeting with employees,

H.R. director Marlin Smith emphasized that the intervention of a third party would interfere with Hendrickson's relationship with its employees:

> [W]e want to make sure you guys know that we are here to support our employees and the best way for us to do that is without a third-party coming in and intervening. So it's difficult to have that conversation when you're bringing in a third-party that doesn't know Hendrickson, doesn't know you, doesn't know your families, doesn't know our culture, and our history, because really they're coming in with their own self-interest in a lot of cases in that point. So we want to work directly with the folks that we know, you know us, we've worked together for a long time.

App'x at 38. Smith reemphasized the point when he warned that, after signing an authorization card:

> So at that point you no longer have a voice, you've signed that away to some third- party, and that's what Gary's talking about, where we don't want [a] third party to have to intervene, we want to talk directly to our employees.[1]

App'x at 41. And in the August 24 letter from Randy Lawless, the company included the following, similar language:

> Under current law, your signature on a card forfeits your right to represent yourself. . . . We believe our employees are entitled to the right to represent themselves without third party interference.

App'x at 46.

The ALJ's opinion, which the Board adopted in full, concluded that three of the statements on the PowerPoint slide violated Section 8: "the culture will definitely change," "relationships suffer," and "flexibility is replaced by inefficiency." The opinion held that these statements "indicate[d] with certainty that [Hendrickson] would no longer respond to employee concerns or issues, no matter what they might be, and that employees would lose control over every aspect of their work lives." 366 NLRB No. 7, *9. According to the opinion, such statements were "beyond the permissible communication that unionization will bring about a

---

[1]This statement was also charged as an unfair labor practice in the complaint, but the ALJ found—and the Board agreed—that the statement was protected under *Tri-Cast*. 366 NLRB No. 7, *6–7.

change in the direct relationship between management and employees" because they were not "carefully phrased on the basis of objective fact." *Id.* (citing *Gissel*, 395 U.S. at 618).

Only two of the three Board Members supported this portion of the opinion, however. These two Members defend the ALJ's opinion by pointing to other statements in the slideshow, such as the company's promotion of its "easy-going atmosphere," employees' "freedom to do [their] job," and the company policy of "reward/advancement for those who work hard and produce." 366 NLRB No. 7, *1 n.2. These Members then assume that "atmosphere" and "freedom" are within Hendrickson's control, and therefore a change to these features involves "retaliat[ion]." *Id.* One Member dissented from this part of the opinion, however, arguing that the slide merely described a "fact of industrial life" after unionization and was therefore protected by Section 8(c) and the Board's decision in *Tri-Cast*. *Id.* The dissenting Member points to statements on the same slide that were certainly protected by *Tri-Cast*, such as "you'll be giving up your right to speak for and represent yourself" and "every change to wages, hours, and working conditions requires negotiations controlled by the union—not you." *Id.* According to the dissenting Member, these statements show that the company was discussing changes beyond its control, not methods of retaliation. *Id.*

In our view, the Board's opinion on this issue is inconsistent with *Tri-Cast*, and therefore its application of the law to the facts of this case does not meet the substantial evidence standard. The statements singled out from the PowerPoint slide can only be reasonably understood as elaborating upon and summarizing the company's position on the ineffectiveness of third-party representation, which was a lawful argument for the company to make. The first statement— "the culture will definitely change"—does not have negative connotations in isolation and can only take meaning from the surrounding statements. The statements that "relationships suffer" and "flexibility is replaced by inefficiency" are certainly negative, but context shows that they are protected predictions of the consequences of unionization. The slides at appendix 64 and 65 together show that the "loss of our direct employee *relationship*" (emphasis added) directly stems from the fact that the employees "lose the right to represent themselves." The comments at the August 21 meeting likewise tie interference in the employer-employee relationship to the union's right to intervene: "we don't want [a] third party to have to intervene, we want to talk

directly to our employees." And the August 24 letter similarly emphasizes the company's belief that "employees are entitled to represent themselves without third party *interference*." (emphasis added). Taken together, these remarks show that the only reasonable way to interpret the brief statements at issue is that Hendrickson believes that a union's formal right under Section 9(c) to intervene in the adjustment of grievances renders untenable the casual, efficient communication of the company's "open door policy" and "easy-going atmosphere," and the slide at issue "simply explicates" that position "in layman's terms." *Tri-Cast, Inc.*, 274 NLRB at 377.

Finally, the Board's opinion erroneously suggests that Hendrickson had a duty to present both the pros and cons of union representation. The opinion faults the company's presentation for suggesting that employees would have a more difficult time influencing their working conditions while "ignoring the fact that, although they may not be at the negotiating table, union members most often have a say in developing bargaining proposals concerning their wages and benefits and other working conditions." 366 NLRB No. 7, *9. But Hendrickson had the right to emphasize the negative aspects of the loss of "direct" relationship, as the Board found in the first portion of its opinion, and Supreme Court precedent does not require Hendrickson to provide the counterargument to its own argument. This language in the Board's opinion is inconsistent with the NLRA's policy of "uninhibited, robust, and wide-open debate in labor disputes," *Chamber of Commerce*, 554 U.S. at 68, in which both sides may "express themselves on the merits of the dispute in order to influence its outcome," *Va. State Bd. of Pharmacy*, 425 U.S. at 762 (citing *Gissel*, 395 U.S. at 617–18). Therefore, the Board's conclusion is not supported even by substantial evidence.

**VI**

For these reasons, we GRANT Hendrickson's petition for review and DENY the Board's application for enforcement of its order.

---

**DISSENT**

---

HELENE N. WHITE, Circuit Judge, dissenting.   The majority acknowledges the deference we give to the Board's findings of fact, inferences drawn from those facts, and applications of law to the facts, but the majority then substitutes its own judgment for that of the Board's, giving no deference at all.   Because reasonable minds might accept the evidence in this case as adequate to support the Board's conclusion, *see Vanguard Fire & Supply Co. v. NLRB*, 468 F.3d 952, 957 (6th Cir. 2006) (quoting *Lee v. NLRB*, 325 F.3d 749, 754 (6th Cir. 2003)), I would deny Hendrickson's petition and enforce the Board's order.

*Bargain from scratch.*   The majority does not take issue with the Board's established principle that although an employer's statement that it will "bargain from scratch" with union representatives is not a per se violation of the NLRA, it "is a dangerous phrase which carries within it the seed of a threat that the employer will become punitively intransigent in the event the union wins the election."   (Maj. Op. at 6 (quoting *Coach & Equip. Sales Corp.*, 228 NLRB 440, 440–41 (1977)); *see also* App'x at 204.)   Such a statement can be coercive and violate the NRLA if, when viewed in context, it reasonably conveys that an employer will either "unilaterally discontinue existing benefits prior to negotiations, or [] adopt a regressive bargaining posture designed to force a reduction of existing benefits for the purpose of penalizing the employees for choosing collective representation."   *Coach & Equip. Sales Corp.*, 228 NLRB at 440–41; *see also NLRB. v. Gen. Fabrications Corp.*, 222 F.3d 218, 231 (6th Cir. 2000).

In reaching their decisions the ALJ and the Board set forth these legal principles and applied them to the facts of this case, concluding that Hendrickson's statement that "[t]he Company and any recognized Union would begin the negotiating process from scratch" could, in context, be reasonably "understood by employees to be a threat of loss of their existing wages and benefits."   (App'x at 205).   Although this case by no means presents a flagrant violation of the NLRA, the Board's determination was reasonable and supported by substantial evidence.

As the unanimous Board explained, Hendrickson's letter first reminded employees of the various benefits upon which they relied—a fact the Board found "particularly telling" (*id.*)—and then asserted that union representation would not "preserve job security, lead to greater benefits, or enhance compensation" (*id.* at 45). The letter continued, stating that a union could not promise employees "anything" (*id.*); that "none of the benefits, compensation, or job security that [employees] currently enjoy would be guaranteed" (*id.*); and that bargaining would begin "from scratch" (*id.*), a phrase the Board and this court have recognized as "dangerous." As is often found important in the Board's precedents, Hendrickson's letter did not refute the reasonable inference that it was threatening to retaliate for union activity, such as by indicating that it would bargain with the union in good faith, *see, e.g.*, *Stabilus, Inc. & UAW*, 355 NLRB 836, 855–56 (2010), or by explaining that benefits may go up or down through give-and-take negotiations, *see Shaw's Supermarkets, Inc. v. NLRB*, 884 F.2d 34, 41 (1st Cir. 1989).

Although the majority concludes that the letter "does not evince any intent on the part of company officials to adopt a regressive bargaining posture in response to unionization" (Maj. Op. at 8–9), and that Hendrickson "makes clear that its statement is meant to counter any ideas that union representation would automatically lead to an increase in compensation" (*id.* at 8), nothing in the letter compels those conclusions, and the Board explained why it found that a reasonable employee might perceive the letter as an unlawful threat. We are obliged to defer to the Board's judgment and expertise in this area. *See Dayton Newspapers, Inc. v. NLRB*, 402 F.3d 651, 660 (6th Cir. 2005) ("In assessing the coercive impact of the employer's statements, we defer to the NLRB's judgment and expertise." (citations omitted)).

The majority also suggests that a PowerPoint presentation Hendrickson showed its employees the day after the letter dispelled any threat to reduce or eliminate benefits. The slides began with a news article about Hendrickson's Kendalville plant entitled, "Hendrickson workers increase wages, benefits in early contract settlement." (App'x at 82.) That slide has "Only half the story!" superimposed over the news article in large font, and subsequent slides argued that Kendalville employees were actually worse off as a result of unionization. Thus, reasonable employees may not have interpreted these slides as clarifying that their benefits would be the result of a good-faith, give-and-take negotiation.

Finally, the majority faults the Board for, "[p]erhaps most importantly," failing to consider whether there were other threats or unfair labor practices in determining whether this particular statement was coercive, suggesting that the Board departed from its precedent. (Maj. Op. at 9.) Nothing in the Board's precedent or our caselaw prohibits the inferences the Board made here. The primary case the majority cites states that "[a] close question *sometimes* exists whether bargaining-from-scratch statements constitute a threat of economic reprisal" and thus "[t]he presence of contemporaneous threats or unfair labor practices is *often* a critical factor in determining whether there is a threatening color to the employer's remarks." *Coach & Equip. Sales Corp.*, 228 NLRB at 441 (emphasis added). Rather than require the presence of other contemporaneous threats or unfair labor practices, the Board's and our own precedent simply require that the Board evaluate the challenged statement in context. The Board did that here.

*More onerous working conditions.* I would also defer to the Board's finding that the following statements in the PowerPoint presentation, purporting to describe the "[b]ottom [l]ine" about unionization, violated Section 8: "the culture will definitely change," "relationships suffer," and "flexibility is replaced by inefficiency." According to the majority, the Board's decision lacked substantial evidence because those statements "can only be reasonably understood as elaborating upon and summarizing the company's position on the ineffectiveness of third-party representation"; i.e., "Hendrickson believes that a union's formal right under Section 9(c) to intervene in the adjustment of grievances renders untenable the casual, efficient communication of the company's 'open door policy' and 'easy-going atmosphere,' and the slide at issue 'simply explicates' that position 'in layman's terms.'" (Maj. Op. at 13–14 (quoting *Tri-Cast, Inc.*, 274 NLRB 377, 377 (1985)).)

I do not agree that the majority's interpretation is the only reasonable one. In fact, Hendrickson itself offers alternative interpretations on appeal. (Reply at 22–23 (arguing that "flexibility is replaced by inefficiency" referred to Hendrickson's "internal flexibility to maintain its corporate efficiency," including "flexibility to protect employee jobs during a downturn"); *id.* at 26 (arguing that "relationships suffer" referred to employees' relationships with their coworkers suffering).) The Board saw things differently, concluding that the statements "convey[ed] a threat that, if the employees elect the Union, [Hendrickson] would retaliate by

changing the easy-going culture and adopting a less flexible managerial approach in its workplace relationships." (App'x at 198 n.2.) Although the majority's and Hendrickson's interpretations are plausible, so are the Board's, especially when "tak[ing] into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969). Under these circumstances, "we may not 'displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Henry Ford Health Sys. v. NLRB*, 105 F.3d 1139, 1143 (6th Cir. 1997) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

As the Board explained, a reasonable employee could interpret Hendrickson's challenged statements as threats to retaliate by creating a more onerous work environment. This is particularly true because, as the Board described, the presentation began by describing positively Hendrickson's culture and management's relationship with employees. Thus, the subsequent slide promising a loss of flexibility, change in culture, and deterioration of relationships could be interpreted by a reasonable employee to mean that Hendrickson would retaliate by making the environment less "[e]asy-going" where employees would not have the "[f]reedom to do [their] job" or opportunity for "[r]eward/advancement." (App'x at 53.) *See Gen. Fabrications Corp.*, 222 F.3d at 231 ("[A] simple threat to diminish, however slightly, the quality of employee working conditions should the employees select the Union . . . cannot but effect employee sentiment regarding the decision to support or oppose the Union." (citation omitted)). This goes beyond lawfully commenting about the impact unionization may have on the direct relationship between management and employees. Further, as the Board noted, its conclusion is bolstered by Hendrickson's prior unlawful statement that it would begin the negotiation process from scratch.

Finally, the majority faults the Board for "suggest[ing] that Hendrickson had a duty to present both the pros and cons of union representation" when the Board stated that Hendrickson was "ignoring the fact that, although they may not be at the negotiating table, union members most often have a say in developing bargaining proposals concerning their wages and benefits

and other working conditions." (Maj. Op. at 14.) But this portion of the Board's opinion was not mandating that Hendrickson say anything; rather, the Board was explaining why it rejected Hendrickson's argument that these statements were lawful as statements of objective fact about probable consequences of unionization beyond Hendrickson's control. (App'x at 206 (citing *Gissel Packing Co.*, 395 U.S. at 618).) Accordingly, this critique by the majority is misplaced.

In sum, because the Board's decision is supported by substantial evidence, I respectfully dissent.