83 F.3d 422
 152 L.R.R.M. (BNA) 2384
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
AUTOZONE, INC., Petitioner Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent Cross-Petitioner.
 Nos. 94-6280, 94-6408.
 United States Court of Appeals, Sixth Circuit.
 April 24, 1996.
 
 Before: NELSON and SILER, Circuit Judges; and WISEMAN, District Judge.*
 PER CURIAM.
 
 
 1
 This case comes before this Court on petition of AutoZone, Inc. ("AutoZone") for review of a decision and an order rendered on September 30, 1994 by the National Labor Relations Board (the "Board"). On cross-application, the Board seeks enforcement of the order. We DENY AutoZone's petition to set aside the decision of the Board. Furthermore, we GRANT in full the Board's cross-application for enforcement of its order.
 
 I. Facts and Procedural History
 A. General Background
 
 2
 AutoZone is engaged in the distribution and sale of automotive parts throughout the continental United States. Among its nationwide distribution centers is a facility located in Greenville, South Carolina. The events of this case arose during an effort by the General Drivers, Warehousemen and Helpers, Local No. 28, International Brotherhood of Teamsters, AFL-CIO (the "Union") to seek representation of employees at this facility in Greenville.
 
 
 3
 In October or November of 1992, the Union began an organizing campaign among the employees at the Greenville distribution center. By January 6, 1993, the campaign culminated to the point of recognition demand, and on the following day, January 7, the Union filed a representation petition with the Board. By a letter dated January 8, Greenville Distribution Center Manager Rick Ferguson declined the Union's demand for recognition. On January 11, Ferguson posted a notice to all personnel, advising them of the Union's petition and of AutoZone's opposition. On January 27, the Board's Regional Director approved a stipulation by both AutoZone and the Union that a representation election be held on March 5, 1993 among employees in an agreed-upon bargaining unit.
 
 
 4
 The Union lost the election. Of approximately 203 eligible voters, 57 voted in favor of union representation and 135 voted against, with two challenged ballots. Thereafter, the Union filed objections to AutoZone's conduct, allegedly affecting the election results. Certain of these objections were subsequently consolidated for hearing with a complaint issued by the Board's Regional Director alleging unfair labor practices against AutoZone.
 
 B. AutoZone's Removal of Union Flyers
 
 5
 AutoZone's unlawful conduct first surfaced on January 20, when Supervisor Timothy Schlichting, in the presence of Supervisor Eddie Massey and Personnel Manager Jim Wartinger, removed three or four letter-sized union flyers from a bulletin board, used by employees for sales notices and other personal notes, in the Company canteen. Schlichting, however, did not remove the antiunion materials also posted on the board. Having observed Schlichting's removal of the flyers, employee Reuben Rice complained to Vice President Dennis Roberts about the removal shortly after Schlichting's actions; the flyers were reposted later that day.
 
 
 6
 C. AutoZone's Pay Adjustment Process and Surrounding Conduct.
 
 
 7
 AutoZone uses a pay increase procedure that includes an annual pay "adjustment" for the employees at its various distribution centers, each having its own wage scale. The annual increase is determined separately for each distribution center by its local management and is not guaranteed. In fact, the increase is granted only if a wage survey shows a given distribution center's payscale is not competitive within its geographic area. Once the information is collected, Vice President Roberts reviews it and then makes a recommendation to AutoZone's president. In 1991, AutoZone began conducting its wage surveys and analysis in December, with wage adjustments being made in January 1993.
 
 
 8
 On a routine visit in November 1992 to the Greenville Distribution Center, Roberts was approached by several employees, asking about a wage increase and if so how much. Roberts replied to the best of his knowledge that he expected a wage increase between 4 to 5 percent, but this figure was not yet confirmed. About two weeks later, Roberts returned to Greenville, where both he and management met with small groups of employees to convey the same information about the wage increase. In addition, they added that AutoZone was awaiting the results of a labor market analysis being done in its Phoenix, Arizona distribution center by the Hay Group. If the Phoenix survey showed AutoZone's wages not to be competitive there, AutoZone would then assume its other distribution centers were also not competitive and initiate wage surveys in those areas.
 
 
 9
 In mid-December 1992, Vice President Roberts received a copy of the Hay Group survey, which indicated that AutoZone's pay was no longer competitive in the Phoenix area. In response, Roberts issued instructions to begin wage surveys for all distribution center areas, including Greenville. Having received all the data for AutoZone's distribution centers, Roberts reviewed the material and passed on his wage increase recommendations for all the distribution centers, except for Greenville. Roberts placed the Greenville wage data aside; he did not perform his analysis or finalize a recommendation regarding a pay adjustment for the Greenville Distribution Center. On January 11, 1992, AutoZone's president approved Roberts' recommendations with some modification.
 
 
 10
 According to the data from the wage surveys at the other distribution centers, the wage adjustment at Greenville, had it been made, would have been greater than 5 percent. Furthermore, if the adjustment had been implemented at Greenville, it would have been effective for the pay period beginning January 3, 1993.
 
 
 11
 On January 22, 1993, Vice President Dennis Roberts and Manager Rick Ferguson made a joint speech to the Greenville employees. After a few introductory comments, Ferguson emphasized that "We do not want the teamsters or any other union in our operation!!". He added, "We are completely and entirely against this union getting in here and we will take every legal step available to keep it out!!". Roberts, delivering the second half of the speech, stated:
 
 
 12
 The other issue I want to discuss has to do with the status of pay increases at this [distribution center]. A number of you have asked when or if the 4 to 5 percent increase we had mentioned back in December would be going through. You need to understand that the numbers we mentioned in December were a tentative forecast only. After that time, we decided to re-evaluate the pay situation in this market. Before we were able to gather all the data we needed and reach a final decision, however, the Teamsters' petition came in. Our understanding of the law is that we cannot make changes in the pay or benefits once a petition comes in, unless the decision had been finalized beforehand. We very much regret that the union's poor timing has now tied our hands, but we do not intend to violate the law. The thing to keep in mind, though, is that once the union is beaten in the election--and we feel confident that is exactly what is going to happen here--then we will be able to move forward, free of the restrictions that we now live under. We're sorry we cannot be more specific than that now, but we wanted you to understand the legal status of your pay increase at this time.
 
 
 13
 AutoZone then conducted a question-and-answer session following this speech. In response to a question concerning pay increases at the other distribution centers, Ferguson responded that the average increase was between 12 and 15 percent.
 
 D. AutoZone's Gag Order
 
 14
 On February 11, 1993, several members of the Union's organizing committee approached Ferguson and Roberts to discuss a problem concerning, in essence, discriminatory practice by AutoZone. Reuben Rice, an AutoZone employee, read to them a short handwritten note protesting a company practice of allowing antiunion employees to walk around the facility during work time making antiunion statements to other employees, while prohibiting union supporters from campaigning for the Union during work time. Two days before this meeting, Supervisor Schlichting told employee Stanley Wilson that he would be discharged if he were caught discussing the Union on the job.
 
 
 15
 Later that day, AutoZone assembled all employees, and Ferguson told them there would be no talking whatsoever either for or against the Union during work time. He further stated that such discussion was hampering production and that violators would be subject to discipline, including discharge. This restriction was not in effect during their personal time at breaks, lunch, and before or after work; employees could discuss any topic during these times. Despite these warnings, AutoZone's policy concerning employee conversation remained in effect. That is, employees were permitted to carry on conversations during work as long as it did not interfere with their work.
 
 
 16
 In mid-February, Supervisor Barbara Cunningham told employees during a meeting that any discussion regarding the Union would lead to their being terminated.
 
 
 17
 Around the same time, Supervisor Marshall Hurley told employees, including employee Robin Delk, who were talking in the rest room line that they should not be talking about the Union.
 
 
 18
 On another occasion in mid-February, housekeeping employee James Andrews, while cleaning lavatories in the women's rest room, stopped two female employees coming in to use the facility. Andrews spoke with the two about Union health benefits, which was an issue in the campaign. As a result of the discussion, the women were delayed from returning to their jobs. Later that day, Supervisor Timothy Schlichting told Andrews that he was not to discuss union issues on company time. Schlichting never spoke with the two female employees involved, and he did not issue Andrews a written warning or make a written note of the incident.
 
 
 19
 E. AutoZone Chairman and C.E.O. J.R. Hyde's Speech
 
 
 20
 On February 19, 1993, about two weeks before the election, AutoZone Chairman and C.E.O. J.R. Hyde made a speech to the Greenville Distribution Center employees. In his speech, he emphasized that the election was "serious business" and that AutoZone was "totally opposed to the Teamsters getting in here." Hyde further stated that although AutoZone was completely non-union, he had a long history of dealing with the Teamsters. In fact, he stated "in every instance where the Teamsters have made us lock horns with them, it has been the employees who have suffered most." He stated that the employees had "good sense" if the Teamsters strike record scared them. He described strikes he allegedly experienced at three other AutoZone distribution centers, stating with emphasis that the Union strikes "100 percent of the time." Hyde added that "[c]onsidering the record, [he] would be awfully concerned about what's going to happen [at Greenville] after March 5th [, the election date,] if the [Union were to] win." In a reference to alleged strikes at the three other facilities, he stated, "I do not want any of you or any of us to run the risk of [the Union] making this [distribution center] number 4 on their strike list against us."
 
 Hyde continued:
 
 21
 Nobody wins a strike. At each of the cases I mentioned, both the company and [the Union] survived the strike and are still around. [The Distribution Center at] Nashville is still operating today full bore. So is Sikeston and so is Memphis. The only part of the equation not still there are the employees who allowed the Teamsters to call them out on strike. As Rick and Dennis told you, the 185 strikers at our Nashville warehouse who walked out on an illegal wildcat strike were all fired. Those 185 employees did not get to vote. Not one of them has ever gotten his job back. The strikers in Memphis and Sikeston were all replaced, and none of them have gotten their jobs back to this day. In fact, there is no union today in the Nashville [distribution center], the Sikeston [distribution center], or the Memphis [distribution center]."
 
 
 22
 In addition, describing his attitude toward the Union, collective bargaining, and strikes, Hyde stated:
 
 
 23
 [The Union's] record with me and your management team is just about as bad as you can get. Maybe it's because I take a no-nonsense business approach to dealing with them, and I never suck up to them or try to become pals with [the Union] bosses. I've always dealt fairly and legally with them, but neither do I quake and shake when the word "union" is mentioned.
 
 
 24
 I don't make many bets but I will bet you this--[union representatives] Mr. Barry, Mr. Wood and Local 28 have never dealt with anyone like us. If [the Union] want[s] to play hardball, we can do the same.
 
 
 25
 Don't misunderstand: AutoZone and I don't want a strike; we don't want trouble. But, if [the Union] make[s] demands on us which I am unwilling to accept, I will say, "NO." I guarantee you and Mr. Barry that if I say, "NO," I will mean it and I am ready. If you or he believe for one second that a picket line or a strike at this [distribution center] will make me give one inch--you're dead wrong. And if the organizers think a strike or picket, anywhere else--including the stores--will make me give one inch--then they are dead wrong.
 
 
 26
 I know, as sure as I'm standing here, that if I let anyone--here or anywhere else in this company--think [the Union] is in charge, I might as well close the doors, put a lock on the gate, and throw away the key. I will not let [the Union], with [its] record and [its] own agenda, destroy what you and I have built.
 
 
 27
 F. The Act and the Board's Conclusions and Order
 
 
 28
 Under section 7 of the National Labor Relations Act (the "Act"), 29 U.S.C. § 157, employees "have the right to self-organization, to form, join, or assist labor organizations ... and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection...." According to section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7." In addition, section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3), provides that discrimination in regard to ... any term or condition of employment to encourage or discourage membership in any labor organization" is an unfair labor practice for an employer.
 
 
 29
 Based upon the foregoing, the Board, in agreement with the administrative law judge ("ALJ"), found that AutoZone violated section 8(a)(1) of the Act by removing prounion literature from a plant bulletin board while leaving antiunion literature posted; telling employees that a pay raise was being withheld because the Union had filed a representation petition; imposing a gag order on all working-time talk about unions; and threatening employees with loss of jobs and closure of its facility if they chose union representation. In addition, the Board found in agreement with the ALJ, that AutoZone violated sections 8(a)(1) and (3) of the Act by suspending its pay increase determination process and withholding a scheduled pay increase because of its employee's support for the Union.
 
 
 30
 In order to remedy these unfair labor practices, the Board ordered AutoZone to cease and desist from the violations and from any similar actions interfering with employees exercising their rights under section 7 of the Act. In addition, the Board's order requires AutoZone to complete the Greenville Distribution Center's wage adjustment process, which was unlawfully suspended in January 1993; to implement the resulting pay increase with interest, effective January 3, 1993; and to post copies of remedial notice.
 
 II. Discussion
 
 31
 This Court's standard of review over Board findings is well established. The Board's findings must be sustained as long as they are supported by substantial evidence, even if the reviewing court might have justifiably reached a different conclusion had the matter been before it de novo. 29 U.S.C. § 160(e); Universal Camera Corp. v. NLRB, 340 U.S. 474, 493 (1951); Indiana Cal-Pro, Inc. v. NLRB, 863 F.2d 1292, 1297 (6th Cir.1988). In addition, the Board's application of the law to particular facts arises under the substantial evidence standard. Turnbull Cone Baking Co. v. NLRB, 778 F.2d 292, 295 (6th Cir.1985), cert. denied, 476 U.S. 1159 (1986). We review the Board's conclusions of law de novo. Wilson v. NLRB, 920 F.2d 1282, 1285 (6th Cir.1990), cert. denied, --- U.S. ----, 112 S.Ct. 3025 (1992). Having reviewed the record, we believe that all of the Board's findings of fact are supported by substantial evidence and that there are no errors of law in its decision.
 
 A. Removal of Union Material
 
 32
 Although the Act does not create a right of access to employer bulletin boards, Container Corp. of America, 244 NLRB 318 n. 2 (1979), enf'd in part, 649 F.2d 1213 (6th Cir.1981), once an employer "by policy or practice, ... permits employee access to its bulletin boards for any purpose, section 7 of the Act ... secures the employees' right to post union" or other organizational materials. Union Carbide Corp. v. NLRB, 714 F.2d 657, 660-61 (6th Cir.1983). Accord NLRB v. Challenge-Cook Bros. of Ohio, Inc., 374 F.2d 147, 153 (6th Cir.1967). Accordingly, an employer's discriminatory removal of union notices from the bulletin board violates section 8(a)(1) of the Act. Union Carbide Corp. v. NLRB, 714 F.2d at 661; Challenge-Cook Bros. of Ohio, Inc., 374 F.2d at 153.
 
 
 33
 In the instant case, it is undisputed that Supervisor Schlichting removed several union fliers from a company bulletin board while leaving antiunion material undisturbed. Despite this fact, AutoZone asserts that by reposting the material with an apology within three hours effectively cured any unlawful infringement of employees' section 7 rights.
 
 
 34
 The Board's standard for effective repudiation is set forth in Passavant Memorial Hospital, 237 NLRB 138 (1978). For a repudiation to be effective, it must be timely, unambiguous, specific in nature to the coercive conduct, and free from other proscribed illegal conduct. In addition, adequate publication of the repudiation to the employees is required, and there must be no proscribed conduct by the employer after the publication. Id. at 138-39.
 
 
 35
 In the instant case, AutoZone's conduct failed to meet the Passavant standards. The record lacks any evidence of AutoZone's giving the employees any assurances that it would not engage in any future interference with their statutory rights. Moreover, AutoZone did not refrain from such proscribed conduct. Instead, AutoZone engaged in further unlawful conduct, including a gag rule prohibiting discussion of unions along with a series of coercive threats of retaliation in the event of unionization.
 
 
 36
 AutoZone argues that the Board should have applied the test as set forth in Atlantic Forest Products, 282 NLRB 855 (1987). In Atlantic Forest Products the Board found that even if the Passavant test was not satisfied, an action that would otherwise have been a breach could be cured. Id. In the Atlantic case, the court relied on six factors: (1) only three employees were told of the restriction, (2) remedial action was taken within one half to three hours, (3) employees were told that it was a mistake to impose the regulation, (4) there was no evidence of further violations, (5) a supervisor testified that he understood that lawful solicitation could occur, and (6) the event occurred on the first day the notice was posted. Id. at 872.
 
 
 37
 AutoZone's timely replacement and apology of the union material, however, still does not satisfy the conditions in Atlantic Forest. Unlike the employer in Atlantic Forest, AutoZone did not convey to employees that it recognized that its behavior was improper. Further, an undetermined number of employees were affected. Finally, AutoZone's behavior did not change after the remedial action. Therefore, the violation was not cured because AutoZone's behavior can be distinguished from the employer in both Atlantic Forest and Passavant.
 
 
 38
 B. Employee Conversation: "The Gag Order"
 
 
 39
 Employee conversation generally cannot be restricted during work hours so as to prevent discussion about the union while allowing other topics to be discussed. NLRB v. Olympic Medical Corp., 608 F.2d 762, 763-764 (9th Cir.1979); Visador Co., 303 NLRB 1039, 1041-1042 (1991). However, an employer may restrict campaigning in order to maintain productivity. Ohmite Mfg. Co., 290 NLRB 1036, 1045 (1988); Adco Elec. Inc., 307 NLRB 1113, 1118 (1992).
 
 
 40
 In the case at bar, the record substantially supports the Board's findings that AutoZone promulgated an unlawfully restrictive "gag rule" on February 11, 1993 and that it implemented the rule through subsequent warnings and admonitions to employees. In early February, Supervisor Schlichting threatened employee Wilson with discharge if he were caught discussing the Union on the job. On February 11, some union supporters protested AutoZone's practice of permitting employee worktime anti-union statements while prohibiting pro-union statements. AutoZone responded with a blanket gag rule prohibiting any worktime talk about the Union, but continued to permit employees to engage in worktime conversations about other topics.
 
 
 41
 AutoZone continued to implement its policy in mid-February. Supervisor Cunningham told employees that anyone talking for or against the Union would be terminated, and Supervisor Hurley told employees that they did not need to be talking about the Union. In addition, Supervisor Schlichting told employee Andrews that he was not to discuss union issues on company time.
 
 
 42
 Moreover, as the ALJ noted, the promulgation of this gag rule was unnecessarily restrictive and therefore unlawful. There is no evidence that Union discussion affected production. As the ALJ noted and as reflected by the record, any alleged productivity problem resulted from the employees leaving their work stations and interfering with the work of others, not the topic of conversation.
 
 C. Hyde's Speech
 
 43
 Threats of job loss or plant closure by an employer as a consequence of unionization is a violation of section 8(a)(1) of the Act. NLRB v. Hovey Elec., Inc., 964 F.2d 543, 546 (6th Cir.1992), citing NLRB v. Garon, 738 F.2d 140 (6th Cir.1984). The test is not actual intimidation or coercion, but whether the conduct tends to be coercive or interfere with employees' exercise of their rights. NLRB v. Elec. Steam Radiator Corp., 321 F.2d 733, 736 (6th Cir.1963); NLRB v. Okun Bros. Shoe Store, Inc., 825 F.2d 102, 105 (6th Cir.1987), cert. denied, 485 U.S. 935 (1988).
 
 
 44
 In the case at bar, the Board found that AutoZone Chairman and CEO Hyde's February 19 speech to Greenville employees contained threats of job loss and plant closure in the event of unionization. Those findings are substantially supported by the record. An employer violates section 8(a)(1) of the Act by campaigning against the union on the basis that strikes are an inevitable result of unionization. NLRB v. Thomas Products Co., 432 F.2d 1217, 1218 (6th Cir.1970). Similarly, it is unlawful for an employer to tell employees, without more, that they could lose their jobs to permanent replacements in the event of a strike. Employees must be told of their rights if they return unconditionally from a strike. Laidlaw Corp., 171 NLRB 1366, 1368-1370 (1968), enforced, 414 F.2d 99 (7th Cir.), cert. denied, 397 U.S. 920 (1969). One of these rights is that employers must place permanently replaced strikers on a preferential hiring list if they return unconditionally. Larson Tool & Stamping Co., 296 NLRB 895 (1989). When threat of permanent replacement is combined with job loss, it is not reasonable to infer that an employee will interpret this to mean that a Laidlaw right exists. Baddour, Inc., 303 NLRB 275 (1991).
 
 
 45
 The Board found and the record substantially supports that Chairman Hyde's speech contained both a threat of plant closure and permanent loss of employment. Hyde told the employees his concerns about a union election victory given his personal experience that the Teamsters strike "100% of the time." Words such as these, as noted by the ALJ, convey the message that a successful vote for the Union will lead to a strike. See U.S. Electrical Motors v. NLRB, 722 F.2d 315, 321 (6th Cir.1983), cert. denied, 467 U.S. 1216 (1984). In addition, Hyde emphasized that AutoZone's striking employees at its Memphis and Sikeston distribution centers "were all replaced" and that "none of them have gotten their jobs back to this day." This statement, which equates lawful strikes with permanent replacement and job loss, fails to mention the striker's Laidlaw rights, and is therefore unlawful. Finally, although Hyde did not expressly state he would close the facility, his statement conveyed that message. Hyde stated "[I]f I let anyone ... think [the Union] is in charge, I might as well close the doors, put a lock on the gate, and throw away the key. I will not let [the Union], with [its] record and [its] own agenda, destroy what you and I have built." As the ALJ noted, these words convey the message that Hyde would close the plant rather than see the nonunion status of the facility changed.[1]
 
 
 46
 D. AutoZone's Withholding of Employee Pay Increase
 
 
 47
 An employer violates section 8(a)(1) of the Act by withholding a previously planned, promised, or scheduled employee benefit during an attempt at union organization. Southern Moldings, Inc. v. NLRB, 715 F.2d 1069, 1074 (6th Cir.1983). Similarly, withholding of a promised benefit can violate section 8(a)(3) of the Act, particularly where the employer's action was motivated by a discriminatory intent to discourage employees from engaging in organizational activities. See Turnbull Cone Baking Co. v. NLRB, 778 F.2d 292 (6th Cir.1985), cert. denied, 476 U.S. 1159 (1986); NLRB v. Shelby Memorial Hosp. Ass'n, 1 F.3d 550, 557-58 (7th Cir.1993); Gupta Permold Corp., 289 NLRB 1234, 1234-1235 (1988). Although an employer commits an unfair labor practice by engaging in protected activities and gives pretextual reasons for the discharge, the employer's anti-union animus must contribute to the discharge for the actions to be unlawful. Turnbull, 778 F.2d at 296.
 
 
 48
 In the instant case, the record fully supports the Board's finding that AutoZone withheld a planned and expected pay adjustment it would have otherwise granted based upon the relevant factors indicating that employees were due for a raise. Moreover, the Board found and the record substantially supports that AutoZone discontinued its pay adjustment process and postponed a pay increase at Greenville because of the Union's petition and the Union activities of its employees.
 
 
 49
 The record reflects that a wage adjustment at the Greenville Distribution Center was anticipated as a part of AutoZone's wage adjustment process for January 1993 and that AutoZone communicated to its employees its intention to grant a wage adjustment. AutoZone had followed a practice of granting an annual adjustment in January to employees at each of its distribution centers where local wage surveys indicated that an adjustment was needed in order to remain competitive in the local labor market. In addition, Vice President Roberts received a preliminary report in November that showed an increase in salary would be required to keep the center competitive and told employees in December that he expected the raise to be between 4 and 5%. On January 11, 1993, all reports and wage survey data were available, and adjustments were implemented in the centers excluding the Greenville facility. Under its established policy, the data would have warranted an increase of 4 to 5 percent. After halting its pay adjustment process for the Greenville Distribution Center, Vice President Roberts announced in his January 22 speech that his earlier forecasts had been tentative, that the expected wage adjustment was being withheld, and that the filing of the Union's representation was responsible.
 
 
 50
 In his speech, Roberts stated the pay increase was withheld because it would have been illegal. The ALJ discredited this testimony. The function of the ALJ is to resolve credibility problems, and this Court will "not normally disturb the credibility assessments of the Board or the ... [ALJ] who has observed the demeanor of the witnesses." NLRB v. Norbar, Inc., 752 F.2d 235, 239 (6th Cir.1985). Accordingly, credibility determinations affirmed by the Board must be upheld on review unless they are shown to be unreasonable. NLRB v. Baja's Place, 733 F.2d 416, 421 (6th Cir.1984). Here, AutoZone has failed to show any basis for disturbing the credibility determinations by the ALJ, all of which were affirmed by the Board.
 
 
 51
 As the Board noted and as supported by the record, Roberts exploited his decision and the resulting wage adjustment denial, using it as a weapon during his January 22 speech. He blamed the Union for tying AutoZone's hands and strongly implied that a vote against the Union would restore AutoZone's freedom to grant the pay increase. Intensifying this exploitation, Roberts falsely told employees after the speech that the pay increases taking effect at the other distribution centers averaged from 12 to 15 percent. As the ALJ reasonably inferred, this exaggeration of the average increases at the other distribution centers was calculated to maximize the anger of the Greenville employees toward the Union.
 
 
 52
 AutoZone argues that the employees had no right to expect an increase because its history had been erratic in both timing and amount. This contention is without merit and was properly rejected by the Board. First, the record shows that there had been an annual average adjustment at Greenville in 1989, 1990, and 1991 and that there was a company wide practice of granting adjustments at all of its distribution centers in January. In addition, the ALJ noted and the record supports that AutoZone led its employees to believe that some kind of wage increase would be forthcoming in 1993.
 
 
 53
 In sum, the record supports the Board's finding that AutoZone suspended its anticipated wage adjustment procedure because the employees had assisted the Union and because AutoZone wanted to postpone the pay increases in order to help defeat the Union at the election.
 
 E. Make Whole Remedy
 
 54
 AutoZone contends that a make whole remedy is inappropriate because the wage program lacks definition. This contention lacks merit. AutoZone asserts that an absence of objective discernible criteria prevented a make whole remedy. See Travis Meat & Seafood Co., Inc., 237 NLRB 213 (1978), enf'd denied, NLRB v. Travis Meat & Seafood Co., Inc., 653 F.2d 233 (6th Cir.1980). However, as discussed above, the timing and the process are easily determined. Applying the formula used in the past and at other distribution centers, an amount could be determined. Further, a hearing establishing the amount can be held following enforcement of the order. Hyatt Corp. v. NLRB, 939 F.2d 361, 372 (6th Cir.1991). Therefore, the program has sufficient definition, and a make whole remedy is appropriate.
 
 III. Conclusion
 
 55
 For the reasons stated above, we DENY AutoZone's petition to set aside the decision of the Board, and we GRANT in full the Board's cross-application for enforcement of its order.
 
 
 
 *
 The Honorable Thomas A. Wiseman, Jr., District Judge for the Middle District of Tennessee, sitting by designation
 
 
 [1]
 AutoZone contends that Hyde's statements concerning plant closure are noncoercive under NLRB v. Pentre Elec., Inc., 998 F.2d 363 (6th Cir.1993). This contention is without merit given the differences between the two speeches. In Pentre, this Court, in finding the statements to be lawful, noted the statements in question were objective, contained nothing indicating plant closure or similar consequences to result from action by company officials acting on their own volition, and were not interspersed with antiunion statements. In the case at bar, Hyde's statements reflected a subjective and personal hostility toward the Union, a defiant attitude toward the prospect of dealing with the Union, and plant closure statements both threatening and gratuitous