**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0520n.06

Case Nos. 19-2371/2421

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

<table>
<tr><td>SYSCO GRAND RAPIDS, LLC,</td><td>)</td><td rowspan="13">

**FILED**
Sep 04, 2020
DEBORAH S. HUNT, Clerk

ON PETITION FOR REVIEW AND
CROSS-APPLICATION FOR
ENFORCEMENT OF AN ORDER
OF THE NATIONAL LABOR
RELATIONS BOARD
</td></tr>
<tr><td>    Petitioner Cross-Respondent,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>NATIONAL LABOR RELATIONS BOARD,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>    Respondent Cross-Petitioner,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>GENERAL TEAMSTERS UNION LOCAL</td><td>)</td></tr>
<tr><td>NO. 406,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>    Intervenor.</td><td>)</td></tr>
</table>

BEFORE: SUTTON, COOK, and MURPHY, Circuit Judges.

**I.**

COOK, Circuit Judge. In 2014, workers at Sysco Grand Rapids, LLC began a unionization drive. Managers met the effort with their own campaign advocating against unionization. After losing the ensuing election by a close margin, the General Teamsters Union Local No. 406 filed with the National Labor Relations Board charges of unfair labor practices against the company. In 2019, the Board found that the company committed numerous unfair labor practices and ordered a new election along with other remedies. The company now petitions for review of the Board's order, and the Board's General Counsel cross-applies to enforce the order.

We GRANT the petition for review in part, GRANT the cross-application for enforcement in part, and ENFORCE the Board's order as modified by this opinion.

**II.**

Sysco Corporation, the parent company of Sysco Grand Rapids, LLC, runs the world's largest broad line food supplier. The Grand Rapids subsidiary ("Sysco") markets and distributes food to restaurants, hospitals, schools, and other institutions throughout most of Michigan. It employs just under 400 employees.

In late 2014, several longtime employees began a campaign to unionize Sysco's warehouse workers and truck drivers. Within two months, a majority of eligible employees signed authorization cards signaling their support for representation by the General Teamsters Union Local No. 406.

In response, Sysco and its parent corporation launched an effort to discourage workers from unionizing. The company first created a database for supervisors to log each employee's perceived support for the union. It then held a series of mandatory meetings at which Sysco's highest-ranking officers warned employees that union representation may entail wage and benefit losses. Managers also cautioned employees that they could lose their jobs if Sysco unionized. In a letter circulated to workers, Sysco represented that the "only way" employees could avoid a strike and risk "losing everything" was to vote against unionizing.

In early 2015, Sysco fired one of the leading supporters of unionizing, George Brewster. Sysco also reduced the hours of another union supporter, Jesse Silva, after Silva challenged a manager's criticism of union representation.

The employees ultimately voted against union representation—71 in favor and 82 against. One week later, the local Teamsters union objected to the election results, filing charges of unfair

labor practices against Sysco. Around this time, Thomas Barnes, a senior manager at Sysco's parent company, gathered employees and "defiantly denounced the charges at a captive audience meeting." Barnes "declared that he would never let the Union in" and "knew how to get around the [NLRA], even [if] it meant continuing to violate federal law, because he 'always got away with it.'" Barnes then warned that Sysco "was an insignificant part of the Sysco Corporation organization and [Sysco Corporation] would shut [the Grand Rapids subsidiary] down and move its operations to Detroit if the Union prevailed."

An administrative law judge found Sysco's misconduct pervasive enough to warrant a bargaining order under *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969). A *Gissel* order mandates that the employer bargain with the union, even without the typical certification by the Board following a formal election, when "an employer's unfair labor practices have made the holding of a fair election unlikely and have undermined the union's majority." *Ctr. Constr. Co. v. NLRB*, 482 F.3d 425, 433 n.3 (6th Cir. 2007). The ALJ also recommended imposing various other traditional and special remedies to rectify Sysco's unfair labor practices, including setting aside the election, imposing a broad cease-and-desist order against violating the NLRA, ordering Sysco to conduct a public reading of the Board's notice, and granting the Union access to Sysco's facilities and employees. Sysco filed an administrative appeal.

A three-member panel of the Board unanimously upheld the ALJ's factual findings and unfair-labor-practices conclusions. The panel divided on the proper remedy, however. The majority noted that the passage of four years since the election and significant employee turnover during that time "temper[ed] the need for a bargaining order" and perhaps rendered such an order unenforceable. The majority also recognized that issuing a bargaining order would likely prolong litigation and thus ill serve workers. The majority thus rejected the ALJ's recommendation to

issue a *Gissel* order and instead ordered a new election.  The Board adopted with modifications the other remedies recommended by the ALJ—the cease-and-desist order, notice-reading order, access provisions, and make-whole remedies for Brewster and Silva.  One member dissented in part and would have issued the *Gissel* order.

Sysco filed this petition seeking review of the Board's order, and the Board's General Counsel filed a cross-application to enforce the order.  *See* 29 U.S.C. § 160(e), (f).

**III.**

On a petition for review, we accept the Board's factual findings and unfair-labor-practices conclusions if supported by substantial evidence in the record.  *Id.*  Substantial evidence is not an exacting standard—it means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted).  As usual, we review legal determinations de novo.  *Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. (UAW) v. NLRB*, 514 F.3d 574, 580 (6th Cir. 2008).

**A. Sysco's Discharge of George Brewster**

Sysco challenges on two grounds the finding that it fired George Brewster for engaging in union activity.  Sysco first maintains that the Board lacked substantial evidence establishing that Sysco knew about Brewster's union support.  It goes on to press the point that good cause justified firing Brewster.

In February 2015, Jim Brown, Brewster's supervisor, checked on Brewster as he made a delivery to a restaurant.  Noticing that Brewster left the truck with its keys in the ignition, Brown hid the keys under the driver's seat and left.  As it happens, the next driver that Brown observed that day also left his truck's keys in the ignition.  But Brown responded differently; instead of

hiding the keys and leaving without a word, Brown handed the keys to the driver and counseled him not to do it again.

Meanwhile, Brewster discovered his keys missing and sent Brown an angry text demanding that Brown bring them back. Brewster called another Sysco manager and threatened to take a sick day unless Brown returned the keys. On the same phone call, Brewster complained about Brown's actions, employing several expletives and noting that the customer agreed with him. The manager asked how the customer knew about the situation, and Brewster admitted that he told the customer about the circumstances causing his truck to remain in the customer's parking lot. Brown's own manager quickly reprimanded Brown for hiding the keys.

The next day, Sysco managers met and decided to recommend firing Brewster to Sysco's president. The managers held a meeting with Brewster and asked about the keys incident. Sysco then fired Brewster without providing or documenting a reason. Though its vice president of operations testified that he did not consider leaving keys in the truck's ignition to constitute a basis for termination, Sysco maintains that Brewster's reaction to the incident (using profanity, complaining about the incident to a customer, and threatening to take a sick day) justified firing Brewster. The Board found the episode "an obvious attempt to lure Brewster into acting out" and concluded that Brewster's union activity "was a motivating factor" in discharging him.

***Sysco's knowledge of Brewster's union activity.*** In finding that Sysco knew about Brewster's union support, the Board considered Sysco's records of employees' union activities. Sysco challenges that conclusion here by noting that the Board grounds its conclusion on "hearsay speculation contained in attorney-client privileged documents." Even assuming the validity of this argument, ample alternative evidence shows that Brewster openly engaged in union activity. For example, Brewster signed a union authorization card

and encouraged others to do so, discussed the union with Sysco's vice president, and spoke up in support of the union at a mandatory company meeting.

***Just cause for discharge.*** Sysco supports its firing as justified by Brewster: "(1) threatening to abandon his route and making fraudulent use of a sick day; (2) criticizing the Company's handling of his policy infractions to a customer;" and (3) "engaging in insubordinate behavior and profane language." (Blue Br. at 40.)

Sysco attempts to meet its burden to show that these infractions rather than union animus spurred its firing by noting the weak rationale of the ALJ. According to Sysco, the "ALJ appeared content to merely offer only vague statements about his perception of the Company's normal practices, and unsupported characterizations of the incident involving Brewster's keys." This argument contradicts the record; review of the ALJ's order reveals detailed fact finding about Sysco's disciplinary practices and an exhaustive 2,500-word account of the Brewster keys incident.

Sysco also maintains that the ALJ inappropriately compared Brewster's termination to less severe disciplinary action taken against other workers. Although neither the Board nor the Union counter this argument in their briefs, the Brewster situation would be distinguished by Sysco's specifically and intentionally targeting him.

Finally, Sysco maintains that it would have fired Brewster for his use of profanity, his union support notwithstanding. Given, however, that Sysco accedes to the Board's finding that hiding Brewster's keys was "an obvious attempt to lure Brewster into acting out," and given that employers generally may not use an employee's outburst resulting from an employer-caused problem as grounds for discharge, *see Paradise Post*, 297 NLRB 876, 895 (1990), Brewster's reaction to the keys incident can't justify his termination.

Ultimately, "[s]imply showing that the evidence supports an alternative story is not enough. [The petitioner] must show that the Board's story is unreasonable." *NLRB v. Galicks, Inc.*, 671 F.3d 602, 608 (6th Cir. 2012). In the absence of Sysco showing that the Board unreasonably found that anti-union animus prompted this firing, we uphold the Board's decision. Sysco's arguments offer this court a different take on the circumstances of Brewster's firing. They don't, however, persuade the court that the Board's evaluation was unreasonable.

## B. Sysco's Pre-Election Conduct:

## Protected Speech or Coercive Threats

Under section 8(a) of the NLRA, an employer commits an unfair labor practice when it "interfere[s] with, restrain[s], or coerce[s] employees in the exercise of the rights guaranteed" by the Act. 29 U.S.C. § 158(a)(1). At the same time, under section 8(c), "[t]he expressing of any views, argument, or opinion" by an employer does not constitute an unfair labor practice, as long as the expression "contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). That last section "recognizes both the existence of and limits to an employer's right of free speech under the First Amendment." *Hendrickson USA, LLC. v. NLRB*, 932 F.3d 465, 470 (6th Cir. 2019).

Distinguishing employers' protected speech from unprotected threats can prove difficult, however, because "the only effective way of arguing against the union is for the company to point out to the workers the adverse consequences of unionization." *Id.* (citation omitted). In *Gissel*, the Supreme Court explained that the distinction between lawful advocacy and coercive threats turns on whether the employer communicates a predicted adverse consequence of unionization "outside [the employer's] control" or instead "taken solely on [the employer's] own volition." 395 U.S. at 619 (citation omitted). We sustain the Board's conclusion if the disputed statements—

taken as a whole—had a "reasonable tendency" to be "coercive in effect." *DTR Indus., Inc. v. NLRB*, 297 F. App'x 487, 493 (6th Cir. 2008) (citation omitted). Sysco challenges three groups of statements on substantial evidence grounds.

*1. Risk of permanent replacement following strike.* Two months before the election, Shaeffer and Vice-President Twyman sent a letter to employees, warning of consequences resulting from a strike. In pertinent part:

> The Teamsters want you to believe that you can't lose with the Union. THE TRUTH IS: you can lose in good faith bargaining. In fact, YOU CAN LOSE EVERYTHING YOU HAVE BY BEING PERMANENTLY REPLACED IN AN ECONOMIC STRIKE CALLED BY THE UNION OVER ITS DEMANDS AT THE BARGAINING TABLE.

> Please think about it. COLLECTIVE BARGAINING IS NOT A TODAY ONLY CONSIDERATION, IT IS A CAREER GAMBLE.

> And the only way to avoid running the threat of a union strike and losing everything is to VOTE NO in the election.

Sysco contends that this letter did no more than lawfully "inform[] employees that they are subject to permanent replacement in the event of an economic strike." (Blue Br. at 50 (quoting *Eagle Comtronics, Inc.*, 263 NLRB 515, 515 (1982)).)

Though acknowledging that an employer may inform workers about the potential for permanent replacement during an economic strike, the Board's General Counsel reminds that a statement loses protection if it "may be fairly understood as a threat of reprisal against employees or is explicitly coupled with such threats." *Eagle Comtronics, Inc.*, 263 NLRB at 515–16. In context—here, "an aggressive weeks-long, anti-union campaign characterized by pervasive unlawful threats, including other threats of job loss," says the General Counsel—the letter has the appearance of a threat of reprisal. That's particularly so because multiple unchallenged unfair labor practices suffused the surrounding circumstances.

Especially problematic for Sysco is the letter's suggestion that a disastrous strike inevitably will result unless workers vote against the union: "the only way to avoid running the threat of a union strike and losing everything is to VOTE NO in the election." Indeed, "[a]n employer violates section 8(a)(1) of the [NLRA] by campaigning against the union on the basis that strikes are an inevitable result of unionization." *Autozone, Inc. v. NLRB*, 83 F.3d 422 (Table), 1996 WL 200291, at *7 (6th Cir. Apr. 24, 1996) (per curiam). On balance, the statements look like threats and we uphold this part of the order.

***2. Lack of access to supervisors.*** Sysco challenges the Board's conclusion that comments by supervisors Joe Quisenberry and Ted Twyman coercively "[t]hreaten[ed] employees with loss of access to supervisors to discuss working conditions if they choose to be represented by the Union." Quisenberry told an employee "that he would not be able to talk with [him] and others in the same manner if the Union prevailed in the election." Similarly, Twyman warned that union workers could no longer speak directly with managers about working conditions.

An employer lawfully may inform employees that unionizing will curtail its freedom to deal with them directly. *NLRB v. Gen. Fabrications Corp.*, 222 F.3d 218, 231 (6th Cir. 2000). Yet such statements become unlawful when accompanying threats render them coercive. *Id.*

Context matters. When an employee groused about Brewster's firing, Quisenberry responded by warning him that unionizing would foreclose answering him directly (rather than through a union intermediary, presumably). Quisenberry even asked the employee if he served on the union's organizing committee. Quisenberry and Brown again threatened this same employee a few weeks later, with Brown warning that "everything would be totally

different" if the Union won. Quisenberry's and Twyman's statements were also accompanied by uncontested threats about the loss of benefits and stricter discipline. Given the surrounding context, the Board reasonably concluded that the statements about lost access to supervisors constituted coercive threats.

*3. Customer sentiment toward unions and loss of business.* During a mandatory meeting, President Shaeffer told employees that the prospect of unionization concerned him because, in his experience, customers preferred non-unionized companies. Shaeffer also suggested that union employees might refuse to do work that falls outside the union contract, posing a "detriment" to Sysco's business and benefitting the company's competitors.

On appeal, Sysco contends that Shaeffer lawfully expressed his views on customer sentiment toward unions and that the Board thus lacked substantial evidence for characterizing Shaeffer's statement as a coercive threat. Sysco points to two similar cases:

In *Pentre Electric*, this court considered managers' statements that they feared erosion of their customer base if the union prevailed. *NLRB v. Pentre Elec., Inc.*, 998 F.2d 363, 366 (6th Cir. 1993), *abrogated on other grounds by Holly Farms Corp. v. NLRB*, 517 U.S. 392 (1996). The company president told employees that he "did not think we would have a customer base or we would certainly not have the same customer base if we were to go to union," because "many of [the company's] customers did not employ union contractors." *Id.* On those facts, the court held that the employer appropriately made "a prediction as to the precise effects he believes unionization will have on his company," without undue tendency to coerce. *Id.* at 369–70 (citation omitted).

In *DTR Industries*, the company president sent employees a letter predicting possible lost business upon unionization shortly before a representation election. *DTR Indus., Inc. v.*

*NLRB*, 39 F.3d 106, 109 (6th Cir. 1994). The letter contained details about the employer's business model and the potential consequences of unionization due to regulatory and customer requirements. *Id.* It concluded by warning workers that "[w]e will lose some or all of our sole source business and create the danger of losing the confidence of our customers." *Id.* The court determined that the letter consisted of protected employer speech describing "the probable economic consequences of unionization." *Id.* at 113–14.

Shaeffer's statements resemble the protected statements in *Pentre Elective* and *DTR Industries* more closely than they resemble coercive threats. *See also Crown Cork & Seal Co. v. NLRB*, 36 F.3d 1130, 1140 (D.C. Cir. 1994) ("[I]f unions are free to use the rhetoric of Mark Antony while employers are limited to that of a Federal Reserve Board chairman, [] the employer's speech is not free in any practical sense."). No one disputes that Shaeffer truthfully spoke about his experience working with unions, and Shaeffer stands entitled to communicate his views about "the likely economic consequences of unionization that are outside his control." *Gissel*, 395 U.S. at 619 (citation omitted). The Board thus lacked substantial evidence to conclude that Shaeffer's comments constituted coercive threats.

## C. Remedies

Sysco accepts the traditional remedies ordered by the Board—the new election, notice posting, and make-whole remedies for Brewster and Silva—and the Board is entitled to summary enforcement of those. *Hyatt Corp. v. NLRB*, 939 F.2d 361, 368 (6th Cir. 1991). The special remedies are another thing; Sysco seeks relief from those the Board imposed in place of a *Gissel* order—the broad cease-and-desist order, the public notice reading, and the provisions granting access to the company's facilities and employees.

**1. Exhaustion**

The Board's General Counsel argues that this court lacks jurisdiction to consider Sysco's challenges to the special remedies because Sysco failed to raise those arguments before the agency. We disagree.

Section 10(e) of the NLRA provides that "[n]o objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e); *see id.* § 160(f). Decades ago, the Supreme Court described section 10(e)'s exhaustion requirement as "jurisdiction[al]." *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–66 (1982). But in recent years, "the Court has undertaken '[t]o ward off profligate use of the term.'" *Fort Bend County v. Davis*, 139 S. Ct. 1843, 1848 (2019) (quoting *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013)). And it has repeatedly warned us to disregard "'drive-by jurisdictional' rulings" that use the label without discussion. *United States v. Marshall*, 954 F.3d 823, 828 (6th Cir. 2020) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998)). At first glance, *Woelke* appears to be such a drive-by. 456 U.S. at 665–66.

The term "jurisdictional" is "generally reserved to describe the classes of cases a court may entertain (subject-matter jurisdiction) or the persons over whom a court may exercise adjudicatory authority (personal jurisdiction)." *Fort Bend County*, 139 S. Ct. at 1846. Section 10(e)'s exhaustion requirement speaks to the *issues* courts may consider (*e.g.*, the Board's special remedies), not the *classes of cases* it may entertain (*e.g.*, final orders of the Board). In that respect, section 10(e)'s exhaustion requirement strikes us as a "nonjurisdictional claim-processing rule[]" that demands parties "take certain procedural steps at certain specified times." *Id.* at 1849 (citation omitted); *see, e.g.*, *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 511–12 (2014)

(provision of Clean Air Act restricting judicial review to objections "raised with reasonable specificity during the period for public comment" was non-jurisdictional (citation omitted)). Plus, jurisdictional rules should be clear and easy to administer; a rule that turns on "extraordinary circumstances" would be anything but. *See, e.g.*, *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010).

That said, we recognize that the Act's issue-exhaustion requirement appears in the same section of the NLRA—10(e)—that vests subject-matter jurisdiction. 29 U.S.C. § 160(e) ("Upon the filing of such petition, the court . . . shall have jurisdiction of the proceeding and of the question determined therein . . . ."); *see id.* § 160(f). Two circuits have relied on that proximity to conclude section 10(e)'s issue-exhaustion requirement still qualifies as jurisdictional. *Chevron Mining, Inc. v. NLRB*, 684 F.3d 1318, 1329 (D.C. Cir. 2012); *Pub. Serv. Co. of N.M. v. NLRB*, 692 F.3d 1068, 1076–77 (10th Cir. 2012) (Gorsuch, J.). We likewise acknowledge that section 10(e) "speaks to the power of the reviewing *court*, a fact that distinguishes it from many non-jurisdictional requirements addressed only to the *parties*." *Pub. Serv. Co.*, 692 F.3d at 1076.

We decline to resolve this question here because—jurisdictional or not—Sysco satisfied section 10(e) by "appris[ing] the Board of an intention to bring up the question." *NLRB v. Watson-Rummell Elec. Co.*, 815 F.2d 29, 31 (6th Cir. 1987) (citation omitted). "A general objection combined with special circumstances may be sufficient to constitute notice." *Id.* Here, Sysco fully apprised the Board of its challenges to the non-*Gissel* special remedies.

In support of its administrative appeal, Sysco objected to "the ALJ's Remedy." Through that objection, Sysco "raise[d] before the Board, albeit somewhat inexpertly, the issue of" the non-*Gissel* special remedies. *NLRB v. Triec, Inc.*, 946 F.2d 895 (Table), 1991 WL 216465, at *6 (6th Cir. Oct. 24, 1991). And "the Board did consider on the merits" the propriety of those remedies, "thus satisfying the purpose of section 10(e) and thereby preserving those issues for appeal." *Id.*;

*see also, e.g.*, *Facet Enters., Inc. v. NLRB*, 907 F.2d 963, 972 (10th Cir. 1990) (explaining that the "salutary policies underlying § 10(e)[] are not implicated" when "the NLRB fully considered th[e] issue"). Indeed, the Board spent several paragraphs analyzing why it "agree[d] with the [ALJ] that certain special remedies are warranted in light of [Sysco's] extensive and serious unfair labor practices."

What's more, the Board did not adopt the ALJ's non-*Gissel* special remedies in full, instead "amend[ing]" those remedies in several respects. It changed the notice-reading order to require that Shaeffer and Barnes conduct the reading unless the company affirmatively requested a Board agent do so. It limited the scope of the access order to particular Sysco facilities in a two-year period. And it broadened the cease-and-desist order to include "[d]ischarging or otherwise discriminating against employees for supporting the Union or any other labor organization."

Sysco raised specific objections to the Board's special remedies in briefing its motion for reconsideration, its "first opportunity" to do so. *See Spectrum-Health–Kent Cmty. Campus v. NLRB*, 647 F.3d 341, 349 (D.C. Cir. 2011); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. NLRB,* 844 F.3d 590, 598–99 (6th Cir. 2016) ("An objection was 'urged before the Board' if it was raised with sufficient specificity in briefing prior to the Board's decision, or in a subsequent motion for reconsideration."). In denying the motion, the Board explained that Sysco failed to "identif[y] any material error or demonstrate[] extraordinary circumstances warranting reconsideration." That denial evidenced the *second* consideration of the propriety of the special remedies. Under these circumstances, we cannot say that reaching Sysco's remedial challenges would transgress section 10(e)'s "salutary policy . . . of affording the Board opportunity to consider" these issues in the first instance. *Marshall Field & Co. v. NLRB*, 318 U.S. 253, 256 (1943) (per curiam); *see also, e.g.*, *NLRB v. U.S. Postal Serv.*, 833 F.2d

1195, 1203 (6th Cir. 1987) ("[T]he main function of section 10(e) is to allow the Board to consider an issue in the first instance.").

## 2. Merits

Turning to the merits, "the question is 'whether the Board has abused its discretion in fashioning its remedial order.'" *NLRB v. Jackson Hosp. Corp.*, 669 F.3d 784, 787 (6th Cir. 2012) (quoting *NLRB v. Joyce W. Corp.*, 873 F.2d 126, 128 (6th Cir. 1989)). The Board enjoys broad remedial powers, but it cannot "patent[ly] attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Id.* (quoting *NLRB v. Overseas Motors, Inc.*, 818 F.2d 517, 520 (6th Cir. 1987)). As the term remedial suggests, the Board's order "may not be used as an instrument of punishment for the employer." *Decaturville Sportswear Co. v. NLRB*, 406 F.2d 886, 889 (6th Cir. 1969); *see, e.g.*, *Republic Steel Corp. v. NLRB*, 311 U.S. 7, 11–12 (1940).

***Cease-and-Desist Order.*** In addition to ordering Sysco to cease specified unfair labor practices, the Board broadly enjoined Sysco from, "[i]n any other manner[,] interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act."

"To justify a broad order preventing violations of a general section of the Act, there must be evidence in the record to demonstrate that the employer has demonstrated a tendency or a proclivity to engage in such unlawful activity." *NLRB v. Challenge-Cook Bros. of Ohio, Inc.*, 374 F.2d 147, 153–54 (6th Cir. 1967). Here, senior manager Barnes made defiant statements declaring that he "knew how to get around the Act" and would continue violating federal law to keep the Union out because he "always got away with it." Barnes also warned that Sysco Corporation "would shut [the Grand Rapids subsidiary] down and move its

operations to Detroit if the Union prevailed." Barnes affirming his stance to continue violating the Act and his expectation of doing so with impunity justified the Board's broad order. *See Challenge-Cook Bros.*, 374 F.2d at 153–54.

True, Barnes has now retired. But President Shaeffer, who shared the stage with Barnes as he made these pronouncements, apparently remains at the company. In all events, Sysco committed a host of other uncontested labor law violations—including surveilling workers' union activities, promising them benefits for voting against the Union, and prohibiting the wearing of union insignia. In light of these violations, "it was reasonable for the Board to conclude that [Sysco's] misconduct was sufficiently persistent and widespread to warrant a broad cease and desist order." *Federated Logistics & Operations v. NLRB*, 400 F.3d 920, 929 (D.C. Cir. 2005). We decline, however, to enforce the portion of the Board's order prohibiting threats of lost business absent substantial evidence that any such statements violated the Act. (PA at 3, ¶ 1(b).)

***Public Notice Reading.*** As for the Board order to publicly read the notice to Sysco employees during work hours, we acknowledge Sysco's First Amendment objections and join our sister circuits in their skepticism of such orders. "[I]t is foreign to our system to force named individuals to speak prescribed words to attain rehabilitation or to enlighten an assembled audience." *HTH Corp. v. NLRB*, 823 F.3d 668, 677 (D.C. Cir. 2016) (quoting *Conair Corp. v. NLRB*, 721 F.2d 1355, 1401 (D.C. Cir. 1983) (Ginsburg, J., dissenting)). Such orders mandate a "confession of sins" and conjure up "the system of 'criticism-self-criticism' devised by Stalin and

adopted by Mao." *Denton Cnty. Elec. Coop., Inc. v. NLRB*, 962 F.3d 161, 174 (5th Cir. 2020) (quoting *HTH Corp.*, 823 F.3d at 677).

The General Counsel and Union argue that the option for a Board agent to conduct the reading alleviates any First Amendment problems. But like the Fifth Circuit, this option "does not assuage our concerns." *Denton Cnty. Elec. Coop.*, 962 F.3d at 175. The notice is phrased as if Sysco's employees are speaking the words (*e.g.*, "We will not threaten you that a strike is inevitable . . . "). It requires named individuals—Shaeffer and Barnes, if still employed by Sysco—to stand at attention as human demonstratives in the employer's confession of sins. And it runs headlong into the Supreme Court's recognition that compelled speech violations extend to situations "where the complaining speaker's own message was affected by the speech it was forced to accommodate." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 49 (2006).

The Board also lacked justification in ordering a public reading here. It failed to consider how the same evidence that "temper[ed] the need" for a *Gissel* order—the passage of several years and the 30% turnover in Sysco employees—might also undermine the justification for a notice reading. *See, e.g.*, *Emhart Indus. v. NLRB*, 907 F.2d 372, 379 (2d Cir. 1990) ("[W]e must withhold enforcement of orders that will not effectuate any reasonable policy of the act, even where the problems with the order are caused primarily by the lapse of time between the practices complained of and the remedy granted."). Indeed, Barnes has retired, so the Board had no need to punish him individually. Nor was Sysco a recidivist subject to "broader and more stringent" Board remedies. *Serv. Emps. Int'l Union Local 32BJ v. NLRB*, 647 F.3d 435, 450 (2d Cir. 2011) (citation omitted). On these facts,

we deny enforcement of the extraordinary remedy of a public notice reading. *See Denton Cnty. Elec. Coop.*, 962 F.3d at 174.

#### *Access*

The Board's access remedies order Sysco to: (1) allow Union representatives onto Sysco property to respond to managers if and when the company convenes a meeting with workers to address unionization before the next election; (2) grant the Union reasonable access to company bulletin boards; and (3) comply with Union requests for the names and addresses of its current employees.

Ordering access to a company's facilities and employees "cannot be justified as a remedial measure" unless it is "necessary to offset the direct consequences or effects of an employer's unlawful conduct." *United Steelworkers of Am. v. NLRB*, 646 F.2d 616, 639 (D.C. Cir. 1981). This rule represents a commonsense application of the general principle "that a proposed remedy [must] be tailored to the unfair labor practice it is intended to redress." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 900 (1984). But here, neither the General Counsel nor the Union has made any showing that Sysco prevented the Local 406 from reaching Sysco's employees. To the contrary, the record reflects that within a few months of starting its campaign, the Union had collected authorization cards from nearly 100 out of 162 employees.

Without any foundation in a lack of access, the Board's access remedies cannot stand. Because the Board failed to justify how the access remedies would undo the effects of past unlawful behavior by Sysco, they "c[an] not be justified as remedial, but c[an] 'only be explained as containing punitive measures.'" *Fla. Steel Corp. v. NLRB*, 713 F.2d 823, 829 n.7 (D.C. Cir. 1983) (citation omitted). And given the significant lapse in time and the

turnover in Sysco's management and employees—changed circumstances that the Board recognized undermined the need for a *Gissel* order—the access remedies constitute impermissible punishment, not an appropriate exercise of remedial power. *Id.* at 834 ("Absent present effects from the violation at issue, the need for an extraordinary access order to remedy those effects evaporates.").[1]

## IV.

We GRANT the petition for review in part, GRANT the cross-application for enforcement in part, and ENFORCE the Board's order as modified by this opinion.

---

[1] We need not reach Sysco's alternative arguments that the access remedies amount to a de facto *Gissel* order, violate its free-speech protections under the First Amendment and 29 U.S.C. § 158(c), offer a "thing of value" to the Union under 29 U.S.C. § 186(a)(2), and provide "financial or other support" to the Union under 29 U.S.C. § 158(a)(2).